537 A.2d 612

**James A. RICKS, Kevin R. DeShields and Van Allen Lewis**

v.

**STATE of Maryland.**

**No. 55, Sept. Term, 1987.**

Court of Appeals of Maryland.

March 4, 1988.

José Felipé Anderson, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief) Baltimore, for appellants.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves a challenge to the legality of a court order authorizing non-consensual video surveillance by police of suspected illegal drug activities within a residential apartment in Baltimore City. The central issue is whether this type of surveillance is permissible in view of the Maryland Wiretap and Electronic Surveillance Act (the Maryland Act), Maryland Code (1984), § 10–401 to 10–413 of the Courts and Judicial Proceedings Article and, if so, whether the surveillance in this case was violative of the Fourth Amendment's provisions against unlawful searches and seizures. A further threshold issue is also presented; it pertains to standing to raise the Fourth Amendment question in the circumstances of this case.

## I

In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2521 (1970, 1987 Cum.Supp.) (the Federal Act). It did so in the wake of the Supreme Court's decisions in *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), both of which recognized that constitutional strictures existed on both the state and national governments' right to conduct electronic surveillance. *State v. Mayes,* 284 Md. 625, 627, 399 A.2d 597 (1979).

The purpose of the Federal Act was to protect the privacy of the individual while at the same time aiding in the enforcement of the criminal laws. *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *Mayes, supra.; State v. Maddox,* 69 Md.App. 296, 517 A.2d 370 (1986). The Federal Act, therefore, prohibited the interception and use of oral and wire communications unless obtained in strict conformity with the Act's provisions, which prescribed a uniform minimum national standard governing the interception and use of such communications in connec-

tion with a number of designated criminal offenses.[1] The Federal Act permits state law enforcement officers, if authorized by state statute adopting these national standards, to intercept wire and oral communications, provided that the state law is not more lenient than the Federal Act (although it could be more restrictive). *State v. Siegel,* 266 Md. 256, 292 A.2d 86 (1972).

The Federal Act mandates strict judicial supervision and approval at all stages of the authorized surveillance.[2] Section 2516 inhibits any non-consensual interceptions without first obtaining a court order; an application in support of a request for surveillance must first be approved by designated law enforcement officials and contain a sworn statement of facts justifying interception of wire or oral communications. Under § 2518(1)(b)(i) through (iv) the application for the court order must specify the particular offense under investigation; the nature and location of the targeted interception; the type of communication to be intercepted; and the identity of the targeted individuals. Provisions in § 2518 require that the application state whether traditional investigative procedures have been tried; the requested duration; whether the interception should continue after the desired communication is initially intercepted; and whether previous requests had been made. Other provisions of § 2518 authorize a judge, by ex parte order, to authorize the surveillance upon a determination that suffi-

---

1. Under § 2510(4) of the Federal Act, " 'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." " '[W]ire communication' " is defined as any aural transfer transmitted by wire, cable, or other similar connection using common carrier facilities, 18 U.S.C. § 2510(1). " '[O]ral communication' " is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation," *id.,* § 2510(2) (1970, Supp.1987).

2. The provisions of Title III were amended by the Electronic Communication Privacy Act of 1986, Pub.L. 99–508, in various particulars not significant to the decision in this case.

cient probable cause exists that (1) a particular offense covered by the Act was or will be committed; (2) the surveillance will intercept communications pertaining to the specified offense; (3) the illegal activities are being conducted at the described location; and (4) that traditional investigative methods have been tried and failed, are likely to fail, or are too dangerous to attempt.

Once authorized by court order, the Federal Act requires that law enforcement officers take strict precautionary measures insuring that only communications related to the specified offenses are intercepted ("minimization"), § 2518(5); that all documents be sealed, § 2518(8)(a) and (b); and within a specified time period after termination of the surveillance the parties whose communications were intercepted must be advised ("Inventory Notice"), § 2518(8)(d). A violation of any of these requirements may mandate the suppression of the seized evidence, § 2518(10). *See generally* Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8(2) U.Balt.L.Rev. 183 (1979).

## II

In 1977, pursuant to the provisions of Title III, Maryland adopted its present Wiretap and Electronic Surveillance Act (the Maryland Act); it was modeled upon and closely tracked the provisions of the Federal Act, although in some particulars it was more restrictive than the Federal Act. *Wood v. State,* 290 Md. 579, 431 A.2d 93 (1981); *State v. Baldwin,* 289 Md. 635, 426 A.2d 916 (1981); *State v. Bailey,* 289 Md. 143, 422 A.2d 1021 (1980); *State v. Siegel, supra; Benford v. ABC,* 554 F.Supp. 145 (D.Md.1982). The Maryland Act, like the Federal Act, did not mention video surveillance; both acts governed the interception of wire and oral communications. As authorized by the Federal Act, §§ 10–406 and 10–408 of the Maryland Act permit designated state law enforcement officers, upon the requisite probable cause showing, to apply to a circuit court judge for an order authorizing the interception of wire and oral communica-

tions for the purpose of providing evidence of certain designated criminal offenses including, "dealing in controlled dangerous substances." [3]

### III

On June 8, 1984, officers of the Baltimore City Police Department and Federal Drug Enforcement Agency applied to Judge Milton Allen, a circuit court judge, for an order authorizing simultaneous audio and video surveillance of an apartment in Baltimore City, leased by one Laverne Pickney. In an 84–page sworn application for the order, the affiants, four in number, indicated that their investigation was directed at high echelon individuals associated with a major, multi-dimensional illegal narcotics distribution organization. The subject apartment, according to affiants, was the "cut house" used to process and distribute the illegal drugs. Based on earlier authorized wiretap interceptions of two other "base stations" utilized by the criminal enterprise, the subject apartment was known among the organization's members as "the hill." The application outlined in great detail the genesis and virtually day-to-day progress of the investigation; that the wiretaps had intercepted cryptic and often coded conversations between members of the organization but known by the investigating officers to relate to illegal drug activity; and that the subject apartment was a location regularly frequented, usually in the late night hours, by the organization's members to further their illegal drug activity and, in particular, to dilute, package, and distribute the controlled dangerous substances. Notwithstanding the extensive and lengthy investigation by the affiants, which utilized or considered utilizing all man-

---

**3.** Two Maryland statutes governed the interception of communications prior to the enactment of the present law. Maryland Code (1957), Article 35, §§ 92–99 applied to the interception of wire communications, telephonic and telegraphic. Code (1957), Article 27, § 125A–D pertained to electronic devices used in the interception of oral communications. These statutes were repealed and recodified in Code (1974), §§ 10–401 through –408 of the Courts Article. By ch. 692 of the Acts of 1977, these statutes were repealed.

ner and means of conventional and innovative techniques,[4] the application recited that the police were unable to determine the organization's method of interstate supply and the location of other places where the illegal drugs were stored before distribution. The application explained that the organization's members were so disciplined in their speech as possibly to result in failure of interception of oral communications by audio devices; and that authority was therefore necessary to install a video tape camera within the apartment to observe the various aspects of the illegal enterprise. The application recited that a single surreptitious entry to install both electronic devices was essential to avoid detection and to minimize the danger to those authorized to enter the apartment to install the video camera and bugging device.

According to the affiants, additional evidence was needed to demonstrate sufficient probable cause to arrest the high echelon members of the organization, who were the primary targets of their surveillance. Further in the application, the affiants related that an authorized search of the apartment would not reveal the source or method of the organization's drugs and distribution, nor would it reveal sufficient information to destroy the organization; moreover, an authorized search of the subject apartment at that time would make it impossible to locate other of the organization's stash houses.

In their application, the affiants stated that the lessee of the apartment, Laverne Pickney, did not reside there; that she resided at another named address where her automobile was registered; and neither she nor her motor vehicle was ever observed at or near the subject apartment. The gas

---

4. Pen registers were utilized; long-distance telephone tolls and criminal history records were monitored; various forms of mobile and fixed surveillance were undertaken, as was use of contact and bumper beepers, attempts to obtain codefendant cooperation, to infiltrate the organization, to conduct a grand jury investigation, to the issuance of search warrants, and other investigative methods.

and electric and telephone services were listed in Pickney's name, but the telephone was disconnected.

Finding that the application conformed to all requirements of the Maryland and Federal Acts, as well as with the Fourth Amendment, Judge Allen issued an order authorizing surreptitious entry into the subject apartment to simultaneously install an audio listening device (a "bug") to intercept oral communications and, for purposes of video surveillance, a small camera embedded into the ceiling of the apartment to record the illegal activities.[5] In a 22–page order, Judge Allen concluded that there was probable cause to believe that the controlled dangerous substances laws were being violated by individuals using the subject apartment; that the use of the audio and video devices was necessary and essential to gain evidence leading to the solution of these crimes and the prosecution of all individuals therewith connected. The order specified that evidence could not be otherwise obtained since alternate investigative methods had been tried and failed and will not succeed in the future, or were too dangerous to undertake.

Pursuant to Judge Allen's order, officers entered the air ducts of the apartment through the roof, shaved away part of the dry wall and implanted a miniature camera, focused on the dining room of the apartment. After several weeks of observation and twenty-five hours of recorded video tape, a search warrant was issued to search the apartment on August 7, 1984. Both heroin and cocaine were seized. The appellants Ricks and DeShields were arrested within the apartment. Appellant Van Allen Lewis was also present in the apartment during the raid; he fled and was captured shortly thereafter.

The appellants were charged in the Circuit Court for Baltimore City with possession with intent to manufacture and distribute heroin and cocaine. Prior to trial, they

---

**5.** Judge Allen described the apartment as "a one bedroom apartment consisting of four rooms, located on the third floor of a 3–story apartment building."

moved to suppress the evidence obtained through video surveillance, claiming that it had been obtained by an illegal search and seizure. They also maintained that video surveillance was precluded by the provisions of the Maryland Act, and particularly so because the State law was more restrictive than the Federal Act. The appellants argued that it was the public policy of this State to place greater restrictions on video surveillance than on the interception of less intrusive wire and oral communications, and hence the video tape records should be suppressed.

The court (Bothe, J.) concluded that even though video surveillance was more intrusive than oral or wire interceptions, it was not within the ambit of the Act's provisions and was thus not prohibited. Nor, the court said, had a Fourth Amendment violation occurred. She found that appellants had standing to object, on Fourth Amendment grounds, to the use of the video surveillance; she nevertheless held that the search and seizure were lawful under Judge Allen's order.

At a subsequent jury trial, the appellants were convicted of the offenses charged and they appealed. Writing for the Court of Special Appeals, Chief Judge Gilbert determined that video surveillance of suspected criminal activity was not proscribed by either the Federal or Maryland Act. The intermediate appellate court declined to consider appellants' argument that video surveillance was conducted in violation of the Fourth Amendment. It said that the appellants "failed to demonstrate any violation of an interest of theirs that the Fourth Amendment was designed to protect" and therefore lacked standing to object. In this regard, the court noted that the appellants had admitted at the suppression hearing that they had no proprietary interest in the apartment. As the appellants maintained only that they had been invited to the apartment, and no other evidence being adduced, the court concluded that appellants had no legitimate expectation of privacy for their activities conducted upon the premises. *Ricks v. State,* 70 Md.App. 287, 520 A.2d 1136 (1987). Upon appellants' petition, we granted

**20**

certiorari to consider the important public issues raised in the case.

## IV

■ It cannot be doubted, as appellants assert, that video surveillance is more intrusive than audio surveillance, and that in some particulars the Maryland Act is more stringent than its federal counterpart. Moreover, considerations of public policy, with obvious Orwellian overtones—those of Big Brother watching—are fully evident in this case, involving as it does the use of a camera to observe activities conducted behind closed doors in a residential apartment. In light of these and other considerations, the appellants urge that the Legislature's extensive statutory regulation and strict control of warrant procedures for the use of electronic surveillance command that a court order authorizing surreptitious non-consensual video surveillance and recording of conduct in a private place be declared invalid in the absence of an express statutory provision authorizing such surveillance. In this regard, the appellants say that the State, by seeking authorization for an intrusion more severe than those authorized by the Maryland Act, engaged in activity which the Legislature could not reasonably have intended to sanction. Any other conclusion, appellants argue, would result in the use of clandestine video surveillance without the careful controls the General Assembly required in the Maryland Act for less intrusive modes of electronic surveillance.

Granted that the Maryland Act in some instances is more restrictive than the Federal Act, nevertheless there is nothing in either Act, express or implied, which prohibits or in any way undertakes to regulate video surveillance. The legislative history underlying passage of the Maryland Act in 1977, while scant at best, demonstrates that video surveillance was never discussed, even though that method of investigation was then in known use by the police. *See, e.g., Avery v. State,* 15 Md.App. 520, 292 A.2d 728, *cert. denied,* 266 Md. 733 (1972), a case involving an unsuccessful

Fourth Amendment challenge to the use of a closed-circuit television camera to surreptitiously record the commission of a crime in the victim's own apartment.[6]

A number of federal courts, after considering the provisions of the Federal Act, have concluded that express statutory authorization is not required to conduct video surveillance. In *United States v. Torres*, 751 F.2d 875 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985), the FBI secretly televised the activities of certain terrorists at two "safe houses" used by them to assemble bombs. There, the court order authorized both an audio device and hidden cameras to be installed in every room. Video surveillance had been requested because of concern that audio surveillance alone might be neutralized by the terrorists playing loud music, utilizing code, or assembling the bombs in silence. The court first recognized the power of federal courts to issue conventional search warrants under Rule 41 of the Federal Rules of Criminal Procedure. It reasoned that this power, by extension, would also cover warrants for electronic surveillance, as would the common law powers of the courts to issue particularized warrants. The court rejected the defendants' contentions that Title III deprived the federal courts of their general power to issue warrants for video surveillance. Holding that video surveillance is not covered by Title III, the court explained:

"It does not follow, however, that because Title III does not authorize warrants for television surveillance, it forbids them. The motto of the Prussian state—that everything which is not permitted is forbidden—is not a helpful guide to statutory interpretation. Television sur-

---

6. In 1975, two years prior to the passage of the Maryland Act, two reports were prepared for the General Assembly involving electronic surveillance—the first by a special Senate Investigating Committee assigned to study possible abuse of electronic surveillance by the police, and the second by the Baltimore City Police Department in response to the special committee's report. Neither report addressed video surveillance.

veillance (with no soundtrack) just is not within the statute's domain." 751 F.2d at 880.

Furthermore, while acknowledging that at the time of the enactment of Title III, Congress probably had not considered videotaping, the court concluded that "[i]t would be illogical to infer from Congress's quite natural omission to deal with a nonproblem that it meant to tie the federal courts' hands when and if the problem arose." *Id.* at 881.

The court in *Torres* rejected the argument that the purpose of Title III to protect privacy interests mandated a prohibition of electronic eavesdropping not expressly authorized. It pointed to the dual purpose of Title III—not only to protect privacy interests, but also to facilitate law enforcement.[7] The court then concluded that only the Fourth Amendment covered video surveillance.

In *United States v. Biasucci,* 786 F.2d 504 (2d Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986), the court held that visual electronic surveillance, this time of business offices, was not prohibited by Title III. There, individuals involved in a loan-sharking operation contended that videotapes obtained from a hidden camera ordered simultaneously with separate audio surveillance should have been suppressed as there was no statutory basis for the court's order. Rejecting this argument, the court reasoned, as in *Torres,* that although Title III did not expressly authorize such surveillance, neither did it prohibit it. The court said that "all that can be said is that Congress has not yet enacted any legislation explicitly authorizing domestic electronic video surveillance." *Id.* at 508–09. In support of its analysis, the court pointed out that even though there was no statutory authority for wiretapping prior to the enactment of Title III, the Supreme Court held such court-ordered electronic surveillance permissible in

---

7. *Torres* referred to the Senate reports which stated: "[T]he major purpose of Title III is to combat crime." S.Rep. No. 1097, 90th Congr., 2d Sess. at 70 (1968), U.S.Code Congr. & Admin.News 1968, 2112 at 2157.

*Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), applying a Fourth Amendment analysis to the government's conduct. The court in *Biasucci* then adopted the "compelling" reasoning of *Torres,* holding that television surveillance of private places may be authorized in appropriate circumstances if the demands of the Fourth Amendment are satisfied.

Again, in *United States v. Ianniello,* 621 F.Supp. 1455 (D.C.N.Y.1985), *aff'd,* 808 F.2d 184 (2d Cir.1986), the court addressed the validity of an order authorizing concealed cameras operating simultaneously with independent "bugs" to monitor the business premises of individuals suspected of loan-sharking and extortion. The application for the video surveillance was presented on the same record as the application for the audio portion, and the order correspondingly covered both forms of surveillance. Finding no merit in the argument that without express statutory authorization the video surveillance was constitutionally infirm, the court adopted the reasoning of *Torres* and found such surveillance constitutionally permissible.

*In the Matter of an Application for an Order Authorizing Interception of Oral Communications and Videotape Surveillance,* 513 F.Supp. 421 (D.Mass.1980), the court approved an order authorizing contemporaneous oral and video surveillance of a private dwelling. Noting that the proposed surveillance was "extraordinarily intrusive," that at the time the statute was enacted wiretaps were the most intrusive form of surveillance, and that video surveillance was probably not considered, the court nevertheless found the surveillance not precluded by Title III. *See also United States v. Cuevas–Sanchez,* 821 F.2d 248 (5th Cir.1987) (court-ordered video surveillance of defendant's backyard properly authorized).

Appellants acknowledge that these federal cases hold that Title III relates only to wire and oral communications and does not regulate video surveillance. They urge, however, that we find these cases to be inapposite because the Maryland Act, being more restrictive than the Federal Act,

should be afforded a different interpretation. Of course, construction of the Federal Act by courts may serve as a guide in interpreting the Maryland Act, which it spawned, and which closely paralleled Title III's provisions. *See Baldwin v. State,* 45 Md.App. 378, 380, 413 A.2d 246 (1980), *aff'd,* 289 Md. 635, 426 A.2d 916 (1981), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 144 (1981). We think the federal cases are well considered and, notwithstanding the differences in several provisions between the two laws, it is clear that the Maryland Act, like Title III, reaches only oral and wire communications and does not regulate video surveillance.

Instructive on this point is the holding of the Court of Appeals of New York in *People v. Teicher,* 52 N.Y.2d 638, 439 N.Y.S.2d 846, 422 N.E.2d 506 (1981). There, a dentist was convicted of sexually assaulting female patients while they were recovering from sedation. A narrowly drawn order authorized the installation of a hidden camera in his treatment room which was attached to a separate sound recording device. The court held that as long as certain procedures were followed to protect individual privacy interests, videotaping was permissible if procured by a warrant based on probable cause. The court said that the authority for the video surveillance was found in New York's general search warrant statute and was not prohibited by its statute regulating aural surveillance. Nor was the court persuaded that the warrant must comply with all the provisions of Title III, finding instead that Title III does not apply to video surveillance, nor does it prohibit this type of surveillance.

We thus conclude that the legality of the video surveillance in this case was not directly controlled by the provisions of the Maryland Act, which regulates only the interception of oral and wire communications.[8]

---

8. · In *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the Supreme Court said that a pen register was not encompassed within the provisions of Title III because such

## V

Appellants next argue that the Court of Special Appeals erred when it concluded that they did not have Fourth Amendment standing to challenge the legality of the video search. They further contend that the video surveillance in this case was conducted in violation of the Fourth Amendment, thereby requiring suppression of its fruit.

### (A)

### *Standing*

Appellants' motion to suppress the fruits of the video surveillance was based on Fourth Amendment grounds, presumably that they had an expectation of privacy from having their images and conduct surreptitiously videotaped while in a private residence. In opposition to the motion, the State argued that none of the appellants were lessees of the apartment; that they did not, therefore, have a proprietary interest in the premises; and thus "did not have the same reasonable expectation of privacy that persons who live at that apartment had, and that the activities within that apartment did not lend themselves to traditional enforcement [of a] reasonable expectation of privacy interest." The prosecutor, however, conceded at the outset of the suppression hearing that the appellants were in the apartment at the invitation of the lessee.

The appellants did not appear at the hearing on the suppression motion, and no evidence was offered in support of the motion. The prosecutor told the court at the hearing that "we ... don't have any facts"; that the appellants had not proved that the lessee of the apartment, Ms. Pickney, was ever present at any time at the apartment during the time period in question; and that he was "waiting to cross-

---

devices did not intercept wire or oral communications. A pen register is a device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released; it does not overhear oral communications. *See Smith v. Maryland,* 442 U.S. 735, 736, n. 1, 99 S.Ct. 2577, 2578, n. 1, 61 L.Ed.2d 220 (1979).

examine whatever facts we are presented by the defense." He maintained that the burden was on the appellants to sustain their motion. In response, counsel for the appellants, while conceding that his clients had no proprietary interest in the apartment, simply told the court, without more, that the appellants were "invitees."

Of course, the proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated by the challenged search and seizure. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, n. 1, 130–31, 99 S.Ct. 421, n. 1, 423–24, 58 L.Ed.2d 387 (1978); *Duncan and Smith v. State*, 27 Md.App. 302, 340 A.2d 722 (1975), *vacated on other grounds*, 276 Md. 715, 351 A.2d 144 (1976), *on remand* 34 Md.App. 267, 366 A.2d 1058 (1976), *aff'd*, 281 Md. 247, 378 A.2d 1108 (1977). The application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate" expectation of privacy that has been invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2579, 61 L.Ed.2d 220 (1979). It is not sufficient to establish standing, where challenged, merely to show that one was on the premises where a search occurs. *Rakas v. Illinois, supra*, 439 U.S. at 142, 99 S.Ct. at 429. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), upon which appellants place reliance, "merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas*, 439 U.S. at 142, 99 S.Ct. at 430. The focus of the inquiry is directed to the substance of the defendant's claim that he or she possessed a "legitimate expectation of privacy" in the area searched, *Rawlings, supra*, 448 U.S. at 104, 100 S.Ct. at 2561; "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like," are not controlling, *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430. The determination whether a legitimate expectation of

privacy exists embraces two discrete questions, as stated in *Smith v. Maryland, supra,* 442 U.S. at 740, 99 S.Ct. at 2579, viz: the first is whether the individual, by his conduct, has exhibited a subjective expectation of privacy (that he seeks to preserve something as private), and the second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable (whether the individual's expectation, viewed objectively, is justifiable under the circumstances). A legitimate "expectation of privacy by definition means more than a subjective expectation of not being discovered." *Rakas,* 439 U.S. at 143, n. 12, 99 S.Ct. at 430, n. 12.

As we earlier observed, the appellants produced no testimonial evidence to support their claim of a legitimate expectation of privacy in the apartment. And while appellants' counsel's assertion that the appellants were "invitees" did not constitute evidence, it was confirmatory of the apparent earlier concession by the prosecutor that the appellants were in the apartment at the invitation of the lessee. Moreover, there was an indication in the sworn application for the court order that on several occasions individuals believed to be associated with the illegal drug network, one of whom was the appellant Ricks, used a key to gain entrance, either to the building in which the apartment was located, or into the apartment itself. Under *Rakas* and *Rawlings,* mere presence in another's apartment, without more, would not suffice to establish a legitimate expectation of privacy. More than mere presence, however, is arguably shown in this case. Considering the intrusive nature of the State's activity, as well as the nature of the images seized within the apartment, we shall assume, without deciding, that the appellants had Fourth Amendment standing to challenge the search and seizure in this case.

(B)

*Fourth Amendment Analysis*

■ We hold that the video surveillance in the present case was conducted in accordance with Fourth Amendment

strictures. In *United States v. Torres, supra,* the court, after finding Title III not prohibitive of video surveillance, proceeded to a Fourth Amendment review of the search in that case. Relying upon Title III's provisions for guidance as to the appropriate standard of reasonableness to be applied, the court enunciated a four-part test that must be satisfied to pass Fourth Amendment scrutiny: (1) normal investigative techniques must be shown to have failed or to be unlikely to succeed or to be too dangerous, 18 U.S.C. § 2518(3)(c); (2) a particularized warrant based upon probable cause must be issued containing a description of the targeted communication and related crime, § 2518(4)(c); (3) a definite duration must be set no longer than needed to accomplish the goals of the investigation (not more than 30 days, although judicially approved extensions are permissible), § 2518(5); and (4) minimization precautions must be observed so as not to intercept irrelevant or privileged communications, *id.* 751 F.2d at 883–84. The court declined to adopt other provisions of Title III, reasoning that they were not applicable under a Fourth Amendment analysis. *Accord, United States v. Biasucci, supra; United States v. Cuevas–Sanchez, supra* (not within the province of the court to adopt the technical requirements of Title III not related to the Fourth Amendment, but rather for Congress).

In *People v. Teicher, supra,* the New York Court of Appeals, in considering the Fourth Amendment aspects of court authorized video surveillance of private premises, developed criteria closely paralleling those later applied in *Torres, i.e.,* that a particularized warrant based on probable cause describe the place to be searched and the thing to be seized (the image); that the warrant specify the crime; that the surveillance would aid in the solution of the crime; that no less intrusive methods were available to obtain the evidence; and that proper minimization procedures be followed. In so concluding, the court rejected the argument that because video surveillance is so intrusive, it should be considered *per se* unreasonable under the Fourth Amendment. It concluded that the Fourth Amendment did not

mandate a complete prohibition of video surveillance as long as the warrant is closely scrutinized, the requisite probable cause is found to exist, and procedural safeguards are observed. Applying the Fourth Amendment balancing test, *i.e.,* the reasonable need for the search weighed against the resulting intrusion, *see Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967), the New York court opined that in certain cases the State's high interest in gathering evidence of criminal activity not obtainable except by video surveillance may well justify the use of this more intrusive method.

The record in the present case discloses that the police, in obtaining court authorization to conduct the surveillance, adhered to the criteria outlined in *Teicher* and *Torres.*[9] Under the Maryland Act, to obtain a court order authorizing the interception of wire or oral communications, it is necessary to show (1) that normal, less intrusive investigative techniques would be unavailing, either because they are unlikely to succeed or because they are too dangerous, § 10–408(c)(3) of the Courts Article; (2) that the communication to be intercepted be specified with particularity and as it relates to the offense, *id.,* § 10–408(d)(iii); (3) that such authorization not exceed the time necessary to obtain the evidence, or at any rate, the surveillance may not last longer than 30 days, although extensions may be granted, *id.,* § 10–408(e); and (4) that strict minimization procedures be observed so as to protect irrelevant or privileged communications, *id.*

The record demonstrates that both the police and Judge Allen, who issued the court order authorizing the surveillance, were cognizant of these requirements. In its application, the police alleged facts to show that less intrusive surveillance methods had been tried and failed or, alternatively, why such techniques were unlikely to succeed or were too dangerous. Approximately forty-nine pages of

---

**9.** Appellants do not challenge the existence of probable cause to support Judge Allen's order authorizing the surveillance in this case.

the application detailed why conventional law enforcement techniques were inadequate in solving the case. The application noted that even after extensive surveillance, due to the extraordinary precautions taken and the complex system of buffers built into the organization to insulate the key members, the police were still unable to discover either the source of the drugs, or the scope of the illegal drug operations. The application outlined the numerous investigative techniques which had either been tried with only limited success or had not been advisable to attempt at all (see n. 4, *supra* ).

Secondly, the application described with particularity the nonverbal conduct to be intercepted, *i.e.*, only that pertaining to drug-related activities. Third, strict time limitations were placed on the authorization. The original order met the thirty day time limit, *i.e.*, the surveillance was authorized from June 12, 1984 until July 11, 1984, and then extended to August 7, 1984 upon leave of court, as statutorily permitted.

Finally, the order required that strict minimization precautions be adhered to so that communications and activities not otherwise subject to the order, *i.e.*, those not drug-related, would not be recorded. Specifically, Judge Allen ordered that (1) the camera was to be activated only when someone was in the apartment; (2) that the camera was to be turned off if it was determined that the activity did not relate to or was not a prelude to drug activity; (3) that extremely circumscribed spot monitoring would be allowed only to determine if the activity related to drugs; and (4) that any privileged or private communications not related to drug activities were to be minimized to the maximum extent possible.

■ On its face, Judge Allen's order, admittedly issued upon a showing of probable cause, recited compliance with all statutory prerequisites prescribed by the Maryland Act governing interception of wire or oral communications. In view of the intrusive nature of video surveillance and its

potential for abuse, we think it readily evident in the present state of the law that, ordinarily, video surveillance can only be conducted under a search warrant issued in pursuance of Maryland's general search warrant statute, Maryland Code (1987 Repl. Vol.), Article 27, § 551. As Judge Allen's order in this case was issued in conformity with the requirements necessary to obtain a search warrant, and with the criteria previously discussed, we think the search and seizure of the images was conducted in conformity with Fourth Amendment guarantees.

## VI

Finally, appellants contend that the trial court improperly allowed a detective involved in the investigation to identify them as the videotapes were being shown to the jury. Specifically, appellants urge that the jurors could make this determination on their own, and thus did not need the testimonial assistance of the detective in making the identifications. Therefore, appellants argue, the detective improperly invaded the province of the jury. We do not agree.

The identifications made by Detective Edgerton were based on observations made during the investigation. Significantly, he had personally monitored the videotapes and purported to recognize the appellants. Rather than usurping the role of the jury, he was merely aiding in the identification of the appellants, based on his personal knowledge of their appearance. The conduct of the trial is within the province of the trial court and we will not disturb its rulings absent a clear abuse of discretion. *Crawford v. State*, 285 Md. 431, 451, 404 A.2d 244 (1979).

The Court of Special Appeals, in *Tobias v. State*, 37 Md.App. 605, 378 A.2d 698, *cert. denied*, 281 Md. 745 (1977) found in similar circumstances that such identifications made by an authenticating witness were proper; it said: "The jury saw the tape, and could judge for itself what it showed and whether [the] Detective['s] identifications were accurate." 37 Md.App. at 617, 378 A.2d 698. We agree

**32**

with that rationale and conclude here that the trial judge did not err in permitting the detective's testimony.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.