581 A.2d 45

**Milton McCRAY, Jr. aka Milton Douglas McCray**

v.

**STATE of Maryland.**

**No. 1826, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Oct. 31, 1990.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Christopher J. Romano, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty., for Baltimore City, on brief), Baltimore, for appellee.

Submitted before ROSALYN B. BELL, WENNER and FISCHER, JJ.

FISCHER, Judge.

Milton McCray, Jr., appellant, was convicted by a jury in the Circuit Court for Baltimore City (Pines, J.) of conspiracy to commit bribery, conspiracy to make false entries in public records and subornation of perjury. Subsequently, McCray was sentenced to ten years of incarceration on each separate bribery and perjury charge and three years incarceration on each separate charge of falsifying entries in public records. All sentences were to run concurrently.

Appellant, along with Warren Betters, a Motor Vehicle Administration license examiner, conspired to obtain false drivers' licenses for persons whose licenses had been suspended or revoked. Such persons, including the appellant,

would approach Betters [1] who, for a fee of approximately $500 to $700, would provide them with a license.

Appellant became the "middleman" who would see to the preliminary processing and then pass the request on to Betters. In early June of 1987, Trooper James Johnson of the Maryland State Police, posing undercover as "David Briscoe," contacted the appellant. "Briscoe," after meeting with appellant, made arrangements to acquire a license. "Briscoe" paid a down payment of $120 to appellant, and appellant then took "Briscoe" to the Motor Vehicle Administration (MVA) located at Mondawmin Mall. There, appellant arranged with Betters to obtain a license for "Briscoe." Trooper Johnson, "Briscoe," was not required to take the eye examination; he tendered no proof of identification, and he made deliberate errors on the written law test which Betters corrected. "Briscoe" thereafter received a learner's permit and finally a permanent license. A total of $500 was paid in exchange for the license.

During appellant's trial, Sergeant Earl Dennis testified that he went to appellant's residence and posed as "Andre Williams," an individual whose license had been revoked. Appellant supplied Sergeant Dennis with the necessary forms and accompanied him to the MVA at Mondawmin. There, Betters arranged for Sergeant Dennis to pass all of the tests required to obtain a license. On this occasion $400 was paid.

Appellant, however, told a different story. At trial, McCray stated that in April of 1987 he was arrested by the police for the fraudulent acquisition of a false driver's license from Betters. As a result, he reluctantly worked with the police in their investigation of Betters. To the contrary, the police officers involved in the investigation testified that the appellant was not an informant.

---

**1.** Betters was convicted in a separate trial and received a ten year sentence of incarceration.

Following his conviction, appellant now raises the following issues for our review:

I.  Did the trial court err in admitting hearsay evidence violative of appellant's right to confrontation of an adverse witness?

II.  Did the trial court err in admitting evidence of video surveillance in the absence of a court order?

## I.

█ McCray complains that the trial court erred in admitting hearsay evidence violative of appellant's right to confront an adverse witness.  Specifically, McCray contends that the court erred in admitting the following testimony:

Q.  Now, meeting with Mr. Walker on June 8th, did there come a time when he provided you with anything?

A.  Yes, he did.

Q.  And what was that, Trooper Johnson?

A.  That was information pertaining to—

MR. CARDIN:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Who was supposed to be the individual to be the target to introduce us to another individual at the MVA.

BY MR. ROMANO:

Q.  Did Mr. Walker provide you with anything other than information, in terms of a document or telephone number or anything of that type?

A.  At that point in time, I don't believe so.  I got it another date.

Q.  There did come a time that you did receive a telephone number?

A.  Yes, sir.

Q.  Whose telephone number was it, if you know?

A.  Mr. Milton McCray.

In reviewing the above testimony, we disagree with appellant's contention that the trial court erred in admitting

hearsay into evidence. It is clear to us that the testimony complained of was not hearsay.

██ Hearsay is an out of court statement offered to prove the truth of the matter asserted. The testimony given by Trooper Johnson was not offered to prove the truth of the matter asserted, rather it was offered to explain how Trooper Johnson was able to make contact with McCray and then with Betters. "In criminal cases, an arresting officer or investigating officer should not be put in a false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct." E.W. Cleary, *McCormick on Evidence* § 249 (3d ed. 1984). Consequently, the trial court did not err in admitting Trooper Johnson's testimony.

## II.

██ The thrust of appellant's second issue centers around the police videotaping him walking from his home across the street to the MVA located at Mondawmin Mall.[2] Appellant complains that the trial court erred in admitting into evidence the videotape of appellant crossing the street to the MVA. Appellant notes that the police conducted their video surveillance without an authorizing court order or search warrant. He argues, therefore, that admission of the videotapes into evidence violated the Fourth Amendment to the United States Constitution, since a court order or search warrant was not obtained by the police prior to

---

2. On both September 16, 1987, and October 8, 1987, members of the Maryland State Police conducted video surveillance of McCray. The surveillance resulted in video tapes being shown to the jury. The surveillance was established on the Motor Vehicle Administration's parking lot in such a way that video tapes were made of the front and side of the MVA, in order that the police could monitor people—including McCray—going into and coming out of the MVA during business hours. Likewise, from their vantage point on the MVA parking lot, the police were able to video tape McCray as he left his residence and walked across the street to the MVA. In similar fashion, on October 8, 1987, the State Police were in a position to not only video tape the movements of McCray, but his arrest as well.

conducting the video surveillance. We disagree with appellant's contentions.

McCray relies heavily on the proposition espoused in *Ricks v. State*, 312 Md. 11, 31, 537 A.2d 612, *cert. denied*, 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988) by the Court of Appeals that, "[O]rdinarily, video surveillance can only be conducted under a search warrant issued pursuant to the general search warrant statute." Appellant's reliance on *Ricks* is misplaced.

*Ricks* involved a challenge to the legality of a court order authorizing nonconsensual video surveillance by the police of suspected illegal drug activities within a residential apartment in Baltimore City. The Court of Appeals held that "nonconsensual video surveillance of a residential apartment, allegedly used to prepare illegal narcotics for distribution, did not violate the strictures of the Fourth Amendment, where the affidavit and warrant complied with the Maryland Wiretap and Electronic Surveillance Act, even though the Act was not applicable to video surveillance." *Ricks*, 312 Md. at 28–30, 537 A.2d 612. McCray wishes us to expand *Ricks* to include both private and public video surveillance. This we decline to do.

■ Presently, there is no statutory limitation in the field of video surveillance, and while we find no case factually on point, we are not without guidance in this area. The application of the Fourth Amendment depends on whether the person invoking its protection can claim a reasonable expectation of privacy that has been invaded by governmental action. This query, as aptly noted by Justice Harlan in his concurrence in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967), embraces two requirements. "The first is that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17. The underlying rationale of *Katz* suggests that the Fourth

Amendment is applicable to visual images where the individual has justifiably relied on his privacy.

■ Generally, one walking along a public sidewalk or standing in a public park cannot reasonably expect that his activity will be immune from the public eye or from observation by the police. *See* Note, "Police Use of CCTV Surveillance Constitutional Implications and Proposed Regulations," 13 U.Mich.J.L.Ref. 571 (1980). Consequently, any justified expectation of privacy is not violated by the videotaping of activity occurring in full public view. W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 2.2(e) (1987).

Thus, the videotape surveillance of McCray, in public view, walking across the street to the MVA poses no Fourth Amendment problem. Clearly, the videotape of McCray was captured in a public place and in public view. Consequently, McCray had no reasonable expectation of privacy when he walked on public sidewalks, streets and parking lots, since he voluntarily exposed to anyone interested the fact that he was traveling to a particular destination and meeting a particular individual in a public place. *See Sponick v. City of Detroit Police Dept.*, 49 Mich.App. 162, 211 N.W.2d 674 (1973) (where police officer videotaped in bar talking with known criminals did not have a "reasonable expectation of privacy" because observations occurred in a public place).

Here, the police officers were engaged in a legitimate investigation, and upon first utilizing various investigative activities to ferret out this licensing scheme, the police officers then chose to record their own visual observations with a video camera rather than with a note pad. The officers were observing a public place and positioned the video camera to observe the activities in this public place. As such, any visual observations were not an intrusion into an area where appellant possessed a "reasonable expectation of privacy." The video tape surveillance did not, therefore, constitute a search in violation of the Fourth Amend-

ment.  The videotaping of that which is lawfully observed is not more invasive or unreasonable than personal observation and is just as lawful.  Consequently, neither a court order nor a search warrant was required.  The trial court, therefore, did not err in admitting into evidence the videotapes.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.