914 A.2d 151

Steven CHRISTIAN

v.

STATE of Maryland.

No. 987, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Jan. 2, 2007.

Nenutzka C. Villamar (Nancy S. Forster, Public Defender, on brief), for appellant.

Abraham Fernando Carpio (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., DAVIS and MEREDITH, JJ.

MEREDITH, J.

Based upon a not guilty plea and an agreed statement of facts, Steven Christian was convicted by the Circuit Court for Baltimore City of possession with intent to distribute heroin. On appeal, he raises two issues:

I. Did the circuit court err in denying his motion to suppress evidence?

II. Did the circuit court err in proceeding with a not guilty/agreed statement of facts without first determin-

ing that appellant's jury trial waiver was knowing and voluntary?

Perceiving no error, we shall affirm.

## I.  Suppression Motion

In reviewing the denial of a motion to suppress evidence, the record at the suppression hearing is our exclusive source of facts. *Lee v. State,* 311 Md. 642, 648, 537 A.2d 235 (1988).  "The one invoking Fourth Amendment protection bears the burden of demonstrating his or her legitimate expectation of privacy in the place searched or items seized." *Laney v. State,* 379 Md. 522, 545, 842 A.2d 773, *cert. denied,* 543 U.S. 966, 125 S.Ct. 434, 160 L.Ed.2d 335 (2004). *Accord Ricks v. State,* 312 Md. 11, 26, 537 A.2d 612, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *State v. Savage,* 170 Md.App. 149, 175, 906 A.2d 1054 (2006).  We extend great deference to the suppression court's fact-finding, particularly that court's ability to determine the credibility of the witnesses and to weigh and determine first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990).  When conflicting evidence is presented, we accept the facts as found by the suppression court, unless clearly erroneous, and we review the evidence in the light most favorable to the prevailing party, in this case, the State. *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420 (2001).  After giving due regard to the suppression court's findings of fact, we then make our own independent appraisal by reviewing the law and applying it to the facts of the case. *McMillian v. State,* 325 Md. 272, 281–282, 600 A.2d 430 (1992).

At the hearing on appellant's motion to suppress evidence, Sergeant John Hergenroeder testified that, at approximately 3:00 p.m. on August 31, 2004, he was involved in a covert narcotics surveillance operation on North Glover Street.  Hergenroeder saw appellant walk out of the rowhouse at 19 North Glover, stop on the steps and look around twice before placing a bag inside the screen door of the house.  Appellant went to the corner of the street and sat on the steps of another house.

A man approached appellant and the two had a short conversation. Appellant walked back to 19 North Glover, retrieved the bag from behind the screen door, removed something from the bag, put the bag back inside the doorway, walked back to the corner, and exchanged a small item for U.S. currency. The other man then walked away. Hergenroeder suspected that he had just seen a narcotics transaction, and that the bag left inside the screen door at 19 North Glover was appellant's "stash."

Hergenroeder sent his partner, Detective William Denford, to the house where he had seen appellant leave the bag. He testified that he directed Denford to "... open the white— there was a door there—open that screen and there is a bag right on the ledge, and the stuff should be in that bag." Denford recalled that his instructions were to "take a white bag out of in between a screen door and a wooden door."

Denford found that the white cross-buck screen door opened outward, and that the bag was sitting in the space between the screen door and the closed wooden door. He retrieved the bag without opening the closed front door to the residence. The bag contained 119 gel caps of heroin. Denford communicated this information via radio to Hergenroeder, and appellant was arrested immediately.

Hergenroeder joined Denford in front of the house. As the officers stood in front of the house, Roy Royster arrived and said he lived in the house. Royster advised that the arrested suspect was his brother, who stayed in Royster's living room and basement. Denford asked if the police could "check the house" and Royster said yes. Royster asserted that there were no drugs inside. Royster signed a form consenting to a search of "my residence located at 19 N. Glover St."

When Hergenroeder entered the house, he saw a mattress, a chair, and a stereo unit. On top of one of the speakers was a vial with white powder and a wad of money rubber-banded together. On the floor was a shoe box containing plant material, gel caps, pill presses, a parole card in the appellant's name, and two bags of heroin in a box. Royster denied

knowing anything about his brother's activities, and said that all of the items recovered belonged to appellant.

When Royster testified at the suppression hearing, he contended that he asked the officers why they had to enter his house, and that he only consented after he was told "you can make it easy on yourself or you can make it hard on yourself. . . . [W]e can hold you and get a warrant and just kick your door in and go in." Royster said he showed the police the area of the house that his brother rented and told the officers that Royster, himself, lived upstairs. He described the search as "tearing up and throwing off some stuff." Royster testified, in contrast to the police officers' testimony, that no drugs were visible until the area was disturbed. Royster testified that the police eventually searched the entire house, including his living area.

When appellant was questioned by the police, after being arrested and receiving *Miranda* warnings,[1] appellant told police that the drugs "recovered from 19 N. Glover" were his.

Appellant argues that all of the evidence should have been suppressed, for three reasons. We shall address each in turn.

### A.

First, citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), appellant argues that he had a reasonable expectation that the area behind the screen door of his brother's home was private, and, therefore, the police were required to obtain a warrant before opening the screen door to seize the bag containing the suspected drugs. Appellant argues that the evidence clearly showed that he tried to protect his privacy by placing the bag behind the screen door, and by pulling the bag out to remove drugs, rather than opening the screen door wide and exposing his belongings to public view. Hergenroeder, however, testified that he had a clear view of the bag as appellant "opened the door and

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

retrieved the bag, reached inside—it took him several seconds—removed something from the bag, and placed the bag back inside the doorway."

Whether or not an individual's subjective expectation of privacy is reasonable is determined by an objective evaluation. *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). Even in an otherwise private place, "what a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." *Katz,* 389 U.S. at 351, 88 S.Ct. 507.

We do not consider this situation far removed from the facts of *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), in which the defendant was standing in an open doorway, holding a paper bag, when police approached. She turned away, into the house, and envelopes containing heroin fell from the bag. The Supreme Court concluded that the doorway was a "public place" because Santana was "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." 427 U.S. at 42, 96 S.Ct. 2406.

In *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court noted that there must be an objectively reasonable expectation of privacy in order for the protection of the Fourth Amendment to apply:

Since *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person has a "constitutionally protected reasonable expectation of privacy." *Id.,* at 360, 88 S.Ct., at 516 (Harlan, J., concurring). The Amendment does not protect the merely subjective expectation of privacy, but only those "expectation[s] that society is prepared to recognize as 'reasonable.'" *Id.,* at 361, 88 S.Ct., at 516. See also *Smith v. Maryland,* 442 U.S. 735, 740–741, 99 S.Ct. 2577, 2580–2581, 61 L.Ed.2d 220 (1979).

The Court explained in *Oliver, id.* at 177–78, 104 S.Ct. 1735, that whether a particular location is entitled to Fourth Amendment protection depends upon a variety of factors:

No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant....In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, ..., the uses to which the individual has put a location, ..., and our societal understanding that certain areas deserve the most scrupulous protection from government invasion....

(Citations omitted.)

The suppression court in this case recognized a difference in the way that the public uses the entry door that leads to the private quarters of the home and the screened door between such an entry door and the street. The suppression court found that the screen door in question was of the variety that would be accessible to strangers approaching the residence, stating:

... I started thinking in terms of when deliveries are made to a home, when guests come into a house, what do they do[? T]hey open the [screen] door and knock.

Oftentimes packages are placed within those two doors, and from a common sense perspective standpoint, that area between those doors does not or is not afforded that same level of protection as to the area beyond that wooden door where there is an expectation of privacy.

\*     \*     \*

So I'm finding ... there was no reasonable expectation of privacy within that area, that this is basically from a common sense perspective, it is not protected because too much open use is made of that area, and too much unauthorized use is expected in that area, between the storm door and that interior door for there to be an expectation of privacy....

We agree. The suppression court's factual findings about the nature of the subject screen door are not clearly erroneous. Both the custom of public use of such doors and the

visual permeability of screen doors support the suppression court's conclusions.

A similar analysis was adopted by the court in *United States v. Arellano–Ochoa,* 461 F.3d 1142, 1145 (9th Cir.2006), in a case in which the police officers were confronted with a screen door. The court stated:

Whether opening a screen door breaches a reasonable expectation of privacy depends on the circumstances. During winter in a cold climate, people ordinarily keep the solid door shut. About the only way for mail and package delivery people, solicitors, missionaries, children funding school trips, and neighbors to knock on the door is to open the screen door and knock on the solid door. People understand that visitors will need to open the screen door, and have no expectation to the contrary. The reason why people do not feel that their privacy is breached by opening the screen door to knock is that it isn't; the solid door protects their privacy.

In the summer, when people leave their solid doors open for ventilation, the screen door is all that separates the inside from the outside. People can get a resident's attention by knocking on the screen door without opening it. Where the solid door is wide open, the screen door is what protects the privacy of the people inside—not just their visual privacy, which it protects only partially, but also their privacy from undesired intrusion. Where the solid door is open so that the screen door is all that protects the privacy of the residents, opening the screen door infringes upon a reasonable and legitimate expectation of privacy.

The distinguishing factor is not whether the time of year is summer or winter, but whether the screen door is acting as the perimeter barrier to the residence. *See State v. Kitchen,* 572 N.W.2d 106, 109 (N.D.1997) ("When officers knock on a door where visitors logically would knock, while engaged in legitimate police activities, they have no less right to be there than any member of the public calling at that home."). *See also Fitzgerald v. State,* 153 Md.App. 601, 666–67, 837 A.2d

989 (2003) ("[T]he vestibule of the apartment house was no different than a public street or an open field. The police needed no justification for being there."), *aff'd on other grounds,* 384 Md. 484, 864 A.2d 1006 (2004).

In the present case, the suppression judge found that the solid door to the residence was closed, and that the screen door would have been opened by delivery men and others approaching the house. There was no evidence that the screen door was latched, or that a door knocker or door bell were located on the outside of the screen door. Under the circumstances, we agree with the suppression court's conclusion that appellant had no reasonable expectation of privacy in the space between the screen door and the solid entry door of the rowhouse.

### B.

Next, appellant challenges the suppression court's alternative holding, arguing:

> The trial court ruled in the alternative that even if the Appellant had an expectation of privacy in the area between the two doors, he waived it once he removed the bag from behind the screen door and handled it on the public streets. The Appellant contends . . . he retained a reasonable expectation of privacy in his house, so the court's denial of the motion to suppress on this ground constituted reversible error.

For the reasons set forth in the preceding section of this opinion, we affirm the suppression court's conclusion that appellant had no reasonable expectation of privacy in the space behind the screen door. Accordingly, we need not reach the alternative holding of the suppression court.

### C.

As for the search within the house, the suppression court was entitled to accept the police testimony that (a) the search was by consent of a co-occupant, and (b) all of the objects recovered were visible. The suppression court was

similarly entitled to disbelieve Royster's testimony that evidence was not found until the police ransacked appellant's living quarters.[2]

Appellant contends that Royster did not have the authority to consent to a search of the area that he occupied within his brother's house.[3]  He cites *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), for the proposition that it is only when a landlord and tenant have mutual use of the leased premises that the landlord may consent to a search.  In *Chapman,* the landlord did not live in the same home as his tenant, but alerted police to the possibility of illegal activity there and suggested that they enter through an unlocked bathroom window.  365 U.S. at 612, 81 S.Ct. 776.

That is not the situation in the instant case.  The testimony at the suppression hearing indicated that both men had mutual use of the area where appellant kept his bed and belongings.  Royster (or anyone visiting Royster) would have to walk through the space appellant rented in order to access the area Royster utilized for sleeping quarters.

Accordingly, this case falls within the holding of *U.S. v. Matlock*, 415 U.S. 164, 170–71, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), in which the Supreme Court held that the voluntary consent of a joint occupant of a residence is valid consent to search the space of the co-occupant.  Unlike the situation in *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), appellant has not argued that he expressly objected to the search or made any effort to countermand the consent granted by Royster.

---

**2.** Citing *Dent v. State*, 33 Md.App. 547, 365 A.2d 57 (1976), appellant notes that the authority of the police to seize contraband in plain view without a warrant depends upon the existence of a prior valid intrusion into a constitutionally protected area.  The suppression court correctly determined that Royster's consent was valid and the police were entitled to see whatever was visible to a person entering the house.

**3.** Appellant does not argue that the court erred in accepting the police testimony that Royster was not coerced into consenting to a search of his home.

The suppression court did not err in concluding that Royster could give valid consent for the police to enter the house and see the objects in plain view upon entering.

## II.   Jury Waiver

Rule 4–246 provides that a defendant may waive the right to a trial by jury before the commencement of trial. The rule sets forth the obligations of the trial court when a defendant does so:

> A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily.

In *Kang v. State,* 393 Md. 97, 899 A.2d 843 (2006), the Court of Appeals summarized the critical features of that rule:

> As we have continued to recognize, ultimately, to waive properly this constitutionally protected right the "trial judge must be satisfied that there has been an intentional relinquishment or abandonment of a known right or privilege." . . . The waiver examination depends upon the facts and circumstances of each case. "[T]he questioner need not recite any fixed incantation" when evaluating whether the defendant knowingly and voluntarily waived his or her right to a jury trial. . . . "The court must, however, satisfy itself that the waiver is not a product of duress or coercion and further that the defendant has some knowledge of the jury trial right before being allowed to waive it."

*Id.* at 105–06, 899 A.2d 843 (internal citations omitted). The Court reiterated that there is no requirement that a trial court explicitly ask a defendant if a waiver decision was induced or coerced unless a question about voluntariness is raised by "some factual trigger" on the record. *Id.* at 110, 899 A.2d 843. We also bear in mind that the trial court had the benefit of seeing the defendant's demeanor, tone of voice, facial expres-

sions, gestures and other intangible indicia unavailable to an appellate court. *Id.* at 108, 899 A.2d 843. *Accord Abeokuto v. State*, 391 Md. 289, 317–24, 893 A.2d 1018 (2006).[4]

---

4. In *Zylanz v. State*, 164 Md.App. 340, 349 n. 4, 883 A.2d 257 (2005), *aff'd sub nom. Powell v. State*, 394 Md. 632, 907 A.2d 242 (2006), Judge Sharer wrote for this Court, stating:
    Although neither the Rules nor the case law prescribe any particular litany or mantra, an excellent model spoken form of jury trial waiver is set out in the trial judges' benchbook. Maryland Trial Judges' Benchbook, Sec. CR 1–1105, MICPEL, 1999 Ed. If, after those questions are asked, the trial judge is satisfied that the waiver is knowing and voluntary, he or she ought to state so on the record. Doing so would put the waiver beyond challenge in most cases.
    The model form examination in the above referenced benchbook suggests the following questions:
    A judge should first ensure that a defendant is represented by counsel or has effectively waived the right to counsel. The judge should then personally address the defendant on the record in open court by inquiring:
    1.  Do you understand that you have a right to a trial by a jury?
    2.  Do you understand that, unless you waive, that is, give up, a trial by jury, your case will automatically be tried by a jury?
    3.  Do you understand that a jury trial is a trial by 12 impartial persons selected at random from voter rolls and/or motor vehicle records in this county (Baltimore City)?
    Note: the following form has also been suggested: Do you understand that a jury trial is a trial by 12 impartial persons that you and the State would select from a pool of persons selected at random from voter rolls and/or motor vehicle records in this county (Baltimore City)?
    4.  Do you understand that, for you to be found guilty, all jurors must agree to convict you on evidence that they feel proves you guilty beyond a reasonable doubt?
    5.  Do you understand that, if you waive a jury trial, you will be tried by a judge alone?
    6.  Do you understand that you may not be permitted to change your election if you change your mind later and want to be tried by a jury?
    7.  Have you discussed this matter with your counsel?
    8.  Do you nevertheless desire to waive your right to jury trial and [desire] to be tried by a judge without a jury?
    In view of the recent rash of appeals challenging the adequacy of inquiry into the voluntariness of defendants' guilty pleas, the inquirer would be well advised to add to the above examination such questions as: (a) Are you waiving your right to have a jury trial voluntarily and of your own free will? (b) Has anyone threatened you or put pressure on you to waive your right to a jury trial? (c) Has anyone promised you anything in return for giving up your right to a jury trial? and (d) Are you under the influence of any alcohol, drugs or medication at this time?

In *Powell, supra,* 394 Md. 632, 907 A.2d 242, the Court of Appeals again held that the trial court need not use any particular line of questioning "when evaluating whether the defendant knowingly and voluntarily waived his or her right to a jury trial." 394 Md. at 639, 907 A.2d at 246. The Court expressly rejected the arguments made by the appellants in *Powell* that the trial judge had erred by failing to make an explicit finding on the record as to whether the waiver of jury trial was knowing and voluntary. The Court held: "[W]hile Maryland Rule 4–246(b) mandates that the examination of the defendant ... must be conducted on the record, its language does not compel presently that the trial judge state explicitly on the record that he or she determines the defendant knowingly and voluntarily waived his or her jury trial right." 394 Md. at 641, 907 A.2d at 247.

When appellant appeared for trial in this case, the following colloquy took place:

THE COURT: Sir, how far in school did you go?

THE DEFENDANT: I completed my GED while I was incarcerated.

THE COURT: Can you read and write—

THE DEFENDANT: Yeah.

THE COURT:—the English language?

THE DEFENDANT: Yes.

THE COURT: Your attorney wants to proceed on what's called a not guilty statement of facts, to preserve the record if an appeal is filed, an appeal in this matter, the ruling I just made; do you understand that?

THE DEFENDANT: Yes, sir.

---

We note further that Rule 4–246(b) provides that the examination of the defendant may be "conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof." Consequently, it would behoove the prosecutor to pay close attention to the questions posed by the court and to urge the court to ask additional questions if all areas addressed by the above model questions have not been covered.

THE COURT: When you proceed on a not guilty statement of facts, the State's Attorney will read into the record a statement of what was alleged to have occurred; do you understand?

THE DEFENDANT: Yes.

THE COURT: No witnesses will be called to testify; consequently, you will be giving up your right to be confronted by your accuser, do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: You also understand you are giving up your right to testify in your own behalf and produce witnesses on your own behalf; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You also will be giving up your right to jury trial as well as court trial. I mean, you will be giving up your right to jury trial. A jury trial consists of 12 members of the community, and you and your attorney and the State's Attorney will have a role in the selection of jurors. Before that jury can convict you, all 12 will have to agree the State had proven you guilty beyond a reasonable doubt. If they could not come to a unanimous verdict, State could retry you over and over again; do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: You are giving up the right to jury trial when you proceed in this manner, do you understand?

THE WITNESS: Yes, sir.

THE COURT: What you don't give up is your appellate right, and you have a right to file an appeal of this decision, if there is, in fact, a conviction, do you understand?

THE WITNESS: Yes.

THE COURT: [Defense Counsel], do you have any other questions of qualification on the not guilty statement of facts

DEFENSE COUNSEL: None, Your Honor.

THE COURT: I find . . . he's been advised. . . .

■ Appellant identifies a single phrase as a "factual trigger" that should have alerted the court to the need to

investigate further. He suggests that the statement, "Your attorney wants to proceed on what's called a not guilty statement of facts, to preserve the record if an appeal is filed," seemed to indicate that the waiver was the decision of defense counsel and was the only way to preserve the record for appeal of the denial of his suppression motion.

As *Powell* instructs, our analysis is to be "[b]ased on the totality of the circumstances of the record, including the discourse, statements, and actions." 394 Md. at 643, 907 A.2d at 248–49. As the Court further stated in *Powell, id.,* 907 A.2d at 249, "where the record of the case sufficiently demonstrates that the trial court implicitly determined that the elements of a knowing and voluntary jury trial waiver existed, [Rule 4–246(b) ] is not violated." Viewed in that context, the sentence isolated by appellant appears to be an introductory remark, summarizing what the court has heard from defense counsel. The court then proceeded to inform appellant of the consequences of a waiver and ascertain that he understood his rights.

Appellant also urges us to find the court's advisement defective because the trial court did not expressly state that it was accepting the waiver because it found that he had knowledge of his jury trial right and voluntarily relinquished it. As the Court of Appeals made plain in *Powell,* no such explicit finding is required.

In the instant case, we are satisfied that the trial court made an implicit finding of waiver on the record, even though the court did not use the words appellant would have preferred. The record demonstrates that the trial court first ascertained appellant's ability to understand what was being said and then separately informed him of the rights he was waiving, each time asking if he understood what was being done. Taking into account the questions and answers that the trial court had just finished hearing, and reviewing the record in its entirety, we cannot say that the failure to state the obvious conclusion was a reversible error.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**