548 A.2d 140

Steven KITZMILLER

v.

STATE of Maryland.

No. 73, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Oct. 5, 1988.

Robert C. Hesson, Oakland, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and James L. Sherbin, State's Atty. for Garrett County, Oakland, on the brief), for appellee.

Argued before GILBERT, C.J., and MOYLAN, ROBERT M. BELL, JJ.

GILBERT, Chief Judge.

Steven Kitzmiller was convicted at a non-jury trial in the Circuit Court for Garrett County (Thayer, J.) of manufacturing a controlled dangerous substance and possession of controlled paraphernalia. Subsequently, he was sentenced to a total of two years imprisonment and fined $100.00.

Believing himself wronged as a matter of law, Kitzmiller has journeyed here. That he violated the State's Controlled Dangerous Substances Act is not questioned. What is in dispute is whether the Maryland State Police violated Kitzmiller's Fourth Amendment rights when they trespassed upon his land, scaled a tree to a height of 40 feet, and then, from a distance of 75 yards, peered, with binoculars, into the curtilage surrounding the Kitzmiller residence.

Prior to trial, Kitzmiller moved to suppress the physical evidence because, he contended, the search warrant was invalid in that it had been obtained in violation of the Fourth Amendment. Judge Thayer denied the motion, and the case proceeded on the basis of that common hybrid known colloquially as a "not guilty plea on an agreed statement of facts."

In this Court Kitzmiller mounts a two-pronged attack upon the validity of the search warrant, *videlicet:* 1) the observations made by the state trooper who obtained the warrant were violative of the Fourth Amendment; and 2) the trooper's affidavit in support of the application for the warrant was grounded on fabricated information, thus eradicating probable cause.

Before discussing the merits of the case, we shall set the scene.

The Maryland State Police received a call from the Garrett County Crime Solvers, informing them that an anonymous caller had told the Crime Solvers that marijuana plants were being grown on a property later identified as the residence of Steven Kitzmiller. The anonymous caller had also stated that a brown Plymouth Horizon automobile was located on the property, and that a number of marijua-

na plants had been placed in the vehicle to dry. The information received by the State Police was conveyed to Trooper John Robert Thomas Jr., who proceeded to the property in hopes of corroborating the tip. Thomas entered upon the property from the rear. He proceeded under cover of a densely wooded area to a point approximately 75 yards from the house. There the trooper climbed approximately 40 feet up a tree and, with the aid of binoculars, made the observations which Kitzmiller asserts constituted an unconstitutional abridgment of the Fourth Amendment.

Based on what he allegedly saw, the trooper made application for a search and seizure warrant. The affidavit in support of the warrant recited that Trooper Thomas had seen a garden plot to the rear of the residence, a marijuana plant "approximately eight (8) feet" tall, and "a two-tone brown Plymouth automobile parked at the side of the house." The affidavit further recited "that a check with the Motor Vehicle Administration indicated the following: Steven Harold Kitzmiller, Rt. 2 Box 196B, Swanton, Maryland 21561, 5–9, 165, W/M, DOB 5/30/60."

Contrary to the representations made in the affidavit, the trooper's testimony at the suppression hearing revealed that there was no garden plot to the rear of the house, that no check had ever been made with the MVA, and that the supposed 8 foot tall marijuana plant that the trooper saw was in fact only 2 to 3 feet tall. When the warrant was executed, fifty-one marijuana plants were seized along with various dangerous substance paraphernalia.

## I.

### The Trespass and the Fourth Amendment

We begin our analysis with the United States Supreme Court decision of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). There, the Court held that the legality of a warrantless police intrusion into allegedly private activities depends upon whether a person has a "reasonable" expectation of

privacy in the invaded area. *Id.,* 389 U.S. at 360, 88 S.Ct. at 516. The decision abandoned the approach of prior case law which had held that, to violate the Fourth Amendment, a search had to be trespassory. *See Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). The *Katz* holding shifted the focus to the question of whether the government had violated the privacy upon which the individual had justifiably relied. *See Sproates v. State,* 58 Md.App. 547, 558, 473 A.2d 1289, *cert. denied,* 300 Md. 795, 481 A.2d 240 (1984); *Riley v. State,* 511 So.2d 282 (Fla. 1987).

■ *Katz* and its progeny establish a two-pronged test for determining whether the government intruded upon an individual's reasonable expectation of privacy. First, an individual must demonstrate that he had an actual subjective expectation of privacy. Second, society must be willing to recognize that expectation as reasonable. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed. 2d 220 (1979) (quoting *Katz,* 389 U.S. at 361, 88 S.Ct. at 516); *Sproates v. State, supra.*

This Court's holding in *Johnson v. State,* 2 Md.App. 300, 234 A.2d 464 (1967), is in accord with pre-*Katz* law. In *Johnson,* an officer used binoculars from a distance of 150 feet to view activities occurring in appellant's house. Our predecessors held that there was no constitutional problem because the officer did not physically trespass upon Johnson's property. *Katz* negated *Johnson.*

Beyond question, Kitzmiller satisfies the first prong of the *Katz* test. He clearly had a subjective expectation of privacy in the area immediately to the rear of the house, an area that appears from the record to have been within the curtilage of the home. Since there is no dispute before us concerning *Katz*'s first prong, further discussion is unnecessary. *See California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

We now turn to the consideration of whether Kitzmiller's expectation of privacy was reasonable. Dispositive of the

issue are the recent Supreme Court cases of *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Dow Chemical v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); *California v. Ciraolo, supra.*

In *Dunn,* Drug Enforcement Administration agents, after trespassing upon defendant's property, shined a flashlight into the defendant's barn and observed what they thought to be a drug laboratory. Justice White, for the majority of the Supreme Court, said that the agents' observations were not violative of the Fourth Amendment because they were made while the agents were outside of the curtilage.

Significantly, in *Dunn* the Court noted that even if the officers had peered into an area within the curtilage the decision would remain unaffected. Addressing that particular point, Justice White wrote:

"We may accept, for the sake of argument, respondent's submission that his barn enjoyed Fourth Amendment protection.... But it does not follow on the record before us that the officers' conduct and the ensuing search and seizure violated the Constitution. [T]he officers never entered the barn.... Once at their vantage point, they merely stood outside the curtilage of the house ... and peered into the barn's open front. And, standing as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn."

107 S.Ct. at 1140–41. The Court further stated, "[T]he fact that the objects observed by the officers lay within an area that we have assumed, but not decided, was protected by the Fourth Amendment does not affect our conclusion." *Id.*

The slightly earlier decision in *California v. Ciraolo, supra,* lends support to a police officer's right to observe objects in constitutionally protected areas. The *Ciraolo* Court, upholding a naked eye police observation from an

aircraft at an altitude of 1000 feet, opined, "That the area is within the curtilage does not itself bar all police observation." 476 U.S. at 213, 106 S.Ct. at 1812.

■ Those decisions indicate that the Fourth Amendment is not violated when, as in the case *sub judice,* an officer trespasses upon a defendant's property in order to observe objects that lie within the perimeters of the curtilage. The cases mandate, however, that the officer make his or her observations while remaining outside the curtilage.

The *Dunn* Court declared that crucial to the inquiry concerning the pale of the curtilage is whether the area harbors the "intimate activities associated with the sanctity of a man's home and the privacies of life." The Court observed that curtilage questions should be resolved with particular reference to four factors:

"[1] The proximity of the area claimed to be the curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by."

107 S.Ct. at 1139.

■ The record before us indicates that Trooper Thomas made his observation, as we have said, from 40 feet high in a tree in a woods 75 yards behind the house. The distance from the house and the nature of the area, a thick wooded tract, do not give rise to a reasonable inference that the wooded area was part and parcel of the curtilage of the home.

■ Certainly, if, as the Supreme Court stated in *Dunn,* the police can trespass upon the suspects' property and view what is within the curtilage, then it follows that if the officer remains 75 yards from the curtilage and uses binoculars so as to avoid having his presence detected, the viewing is not violative of the Fourth Amendment. *Id.*

*United States v. Minton,* 488 F.2d 37 (4th Cir.1973), supports this conclusion. There, federal agents, acting on a tip that illicit whiskey was to be delivered to defendant's building, stationed themselves on top of a 12 to 14 foot high embankment and, with the aid of binoculars, looked at a building 90 feet away. The Court held that the agents' conduct did not violate the defendant's reasonable expectation of privacy.

Furthermore, the Supreme Court, in addressing an alleged Fourth Amendment violation involving aerial photography with a camera equipped with magnification capabilities, declared that "[t]he mere fact that human vision is enhanced somewhat ... does not give rise to constitutional problems." *Dow Chemical Co. v. United States,* 476 U.S. at 238, 106 S.Ct. at 1827. *Dow* was concerned with what might be termed a commercial-industrial curtilage, not a residential one. Nevertheless, the enhanced vision concept applies also, we think, to residential curtilages.

The binoculars employed in the case at bar were for the purposes of seeing into an open area within the curtilage. If a person places contraband within an open area of a curtilage where it may be readily seen by others, even trespassers, the person who placed the contraband where it could be seen may not assert that he who saw should not have looked.

Police officers are not required to wear blinders when viewing the exposed areas within the curtilage of a suspect's property. Scaling a tree to a height of 40 feet and looking from a distance of 75 yards with binoculars into an open, unfenced area is more akin to viewing that area from an airplane than climbing a ladder and peering over a fence. *Compare California v. Ciraolo, supra,* with *State v. Boynton,* 58 Haw. 530, 574 P.2d 1330 (1978) (officer violated defendant's reasonable expectation of privacy by climbing on top of defendant's 6 foot fence to peer over it and view marijuana).

We hold that the trooper's reconnaissance made from a vantage post outside the curtilage of the Kitzmiller residence did not, under the attendant circumstances, violate the latter's expectation of privacy. Hence, there was no violation of Kitzmiller's Fourth Amendment rights.

## II.

### *The Affidavit in Support of the Warrant*

The Supreme Court, speaking through Justice Blackmun in *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), held that the fruits of a search warrant may be excluded upon a successful challenge to the truthfulness of the factual statements made in the affidavit that supports the warrant. Justice Blackmun penned that if

"perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

438 U.S. at 156, 98 S.Ct. at 2676.

The trooper in this case made the following misstatements in the affidavit: 1) he implied that a license plate check was made with the MVA; 2) he observed a garden plot to the rear of the house; and 3) he observed a marijuana plant 8 feet tall growing in the garden.[1]

The trooper's assertion that he observed a marijuana plant growing behind the house was true, even though it was not as gigantic as the trooper characterized it. The plant was in a container 2½ feet tall, and that factor may

---

1. Judge Thayer's characterization of the trooper's incorrect representations as "misstatements" may have been most charitable. They were at worst outright lies and at best they turned an otherwise simple case into a complex one.

have distorted the officer's perception. The observation of the plant, however, was enough in and of itself to establish probable cause. Consequently, when we peel away all of the erroneous statements contained in the affidavit, we are nevertheless left with probable cause for the issuance of the warrant.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.