28 A.3d 720

**Carrie McGURK**

**v.**

**STATE of Maryland.**

**No. 00501, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Sept. 7, 2011.

---

George Harper, Upper Marlboro, MD, for appellant.

Edward J. Kelley (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., HOTTEN, and JAMES P. SALMON (Retired, Specially Assigned), JJ.

JAMES P. SALMON (Retired, Specially Assigned), J.

At approximately 3:15 a.m. on June 29, 2009, Carrie McGurk and a male companion were on the second floor balcony of a house located at 608 Philadelphia Avenue, Ocean City, Maryland. An Ocean City police officer, who was passing by on his bicycle, saw the couple. He parked his bike, and, uninvited, walked up one flight of stairs and entered onto the balcony. The officer was later joined on the balcony by one of his police colleagues, who was also uninvited. Based upon what the police officers saw on the balcony, Ms. McGurk was arrested and twice searched. As a result of what was found in the searches incident to her arrest, she was charged with possession of marijuana, and possession of cocaine with the intent to distribute, and various other drug offenses.

Ms. McGurk filed a motion to suppress the evidence that was taken from her by the police, as a result of the searches. After a hearing was held, the motions judge, without comment, denied the suppression motion.

Ms. McGurk elected a bench trial and proceeded on a not-guilty agreed statement of facts as to the charge of possession with the intent to distribute cocaine. The trial judge found her guilty of that offense and sentenced her to three-years incarceration but suspended all that sentence in favor of a period of probation.[1]

In this appeal, Ms. McGurk contends, for various reasons, that the motions judge erred in denying her motion to suppress. The most important issue raised is whether the police officers, who entered onto the second story balcony, physically intruded into a "constitutionally protected area" i.e., an area in which Ms. McGurk had a reasonable expectation of privacy. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19

---

1. One of the conditions of probation was that Ms. McGurk forfeit the $813.00 the police found in her possession at the time of her arrest.

28

L.Ed.2d 576 (1967). The issue is important because if the intrusion was into a "constitutionally protected area," all the evidence seized by the police incident to the arrest should have been suppressed based on the "fruits of the poisonous tree doctrine." *Wong Sun v. Untied States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

# I.

## Facts Established At The Suppression Hearing[2]

Philadelphia Avenue is a two-way street in Ocean City, Maryland, that runs north and south. The place where Ms. McGurk was arrested, 608 Philadelphia Avenue, is approximately 13 blocks north of the inlet, which is the southern most part of Ocean City. That address is on the east side of Philadelphia Avenue and has a front porch and a balcony. The floor of the balcony is 10 feet above ground. A waist high wooden railing is on the west and a portion of the north side of the balcony. Both the front porch and the balcony face Philadelphia Avenue. A person on the balcony can gain entrance into the living quarters of the dwelling by accessing a door at the rear (east side) of the balcony.

At the time Ms. McGurk was arrested, the balcony was decorated with flowers and plants. A glass table was positioned towards the south-end of the balcony. Additionally there was "a two-person style rocking chair" and at least one other chair on the balcony. Below the balcony, on the west side of the front porch, there is a very narrow lawn that is adjacent to the sidewalk that borders on Philadelphia Avenue. The first step on the staircase that leads to the balcony is very

---

2. In part I of the opinion, we recount the facts developed at the suppression hearing, in the light most favorable to the State-the party that prevailed below. *See Morris v. State*, 153 Md.App. 480, 489, 837 A.2d 248 (2003) (when reviewing the denial of a motion to suppress, we accept that version of the evidence most favorable to the State and in doing so resolve all ambiguities and inferences in favor of the State and against the losing party).

close to the sidewalk. From the stairs, the entrance onto the balcony is on the north side.

On June 29, 2009, Carrie McGurk was on the second-floor balcony of 608 Philadelphia Avenue, as was Roberto Villagra. According to Ms. McGurk's uncontradicted testimony, on the date of her arrest she was an overnight guest of one Brady Cox, who leased the Philadelphia Avenue premises. She had brought with her an overnight bag and planned to stay for the night at 608 Philadelphia Avenue.

At approximately 3:15 a.m. on the morning in question, Ocean City police officer Michael Valerio, while in uniform, was riding his patrol bicycle south-bound (i.e., towards the inlet) on Philadelphia Avenue when he smelled the odor of burnt marijuana. He turned his bicycle around and peddled approximately 60 feet north of 608 Philadelphia Avenue in an attempt to locate the source of the odor. He then looked back towards the south and saw two people sitting on a balcony. Officer Valerio approached the staircase that led to the second-floor balcony at 608 Philadelphia Avenue and "radioed for additional officers to help [him] locate the source of the marijuana."

Before any of his fellow officers arrived, Officer Valerio, uninvited, walked up the stairway to the second-floor balcony. Once on the balcony, Officer Valerio identified himself as a police officer and asked the porch occupants "what are you up to tonight" or "what are you doing tonight?" Mr. Villagra replied that they were "just watching traffic." Officer Valerio then inquired "were you doing anything else?" As he asked the last question the officer "got closer to" Mr. Villagra and smelled "the odor of burnt marijuana, THC, which [he] knew through [his] training and knowledge and experience" was coming from Villagra. This led Officer Valerio to believe "that there had been other things going on that night."

Officer Valerio asked Villagra "if he had any marijuana on him." Villagra said that he did not. Officer Valerio next asked "is it a little bit, or did you just have a lot more on you?" That awkwardly phrased inquiry was repeated by the officer

"one or more times" whereupon Villagra said that he had smoked a "roach" but had thrown the "roach" off the balcony. By the time Officer Valerio obtained that admission, two "back-up officers" (PFC. Kelley and Officer Perry) had arrived to assist him.

Officer Valerio then went down the stairwell and found, in the front yard, a small marijuana "roach" that was still warm. He collected that evidence, brought it back up to the balcony, held it in his hand and asked Villagra if the "roach" that he had found was the marijuana cigarette that Villagra had thrown away. Villagra admitted that it was. Officer Valerio then placed Villagra under arrest.

Officer Charles Kelley arrived at 608 Philadelphia Avenue approximately 5 minutes after Officer Valerio's arrival. Officer Kelley climbed the steps to the second-floor balcony to assist Officer Valerio who by that time had already made a "custodial arrest" of Villagra.

Officer Kelley initiated a conversation with Ms. McGurk. He asked her what her relationship was to Villagra, how she knew him, how long she was staying in Ocean City, and whether she was on vacation. While he made those inquiries, he stood only 2½ feet away from Ms. McGurk. His proximity to her allowed Kelley to "immediately detect an overwhelming odor of burnt marijuana coming from her person." After smelling marijuana, he asked if he could see Ms. McGurk's identification. When she opened her purse to get her identification, Officer Kelley observed a "prescription style" orange bottle with a white lid. The bottle was transparent which allowed him to see, "in plain view" that inside the bottle was a "glassine cellophane type baggie" that contained a "greenish-brownish leafy vegetable like substance." He recognized through his "training, knowledge and experience as a police officer" that the leafy substance was marijuana.

Officer Kelley ordered Ms. McGurk to give him the prescription bottle. She did not comply with that command but instead tried to conceal the bottle in her hand. She also attempted to remove other objects from her purse and to

"shove them towards her front pocket...." He then advised Officer Valerio, who was standing nearby, that Ms. McGurk was under arrest. The arrest occurred at 3:27 a.m., approximately seven minutes after Officer Kelley arrived at 608 Philadelphia Avenue.

After Ms. McGurk was handcuffed and placed under arrest, she was removed to a "safer area on the sidewalk" and searched by Officer Valerio, who found $813.00 in the rear pocket of her pants.

Officer Valerio described how he searched the upper part of Ms. McGurk's body, which was covered by both a tank top and a bathing suit top, as follows:

> I used my index finger and thumb of my right hand and grabbed the middle area between the swim suit and pulled that away from her body and still underneath the tank top to see if there was any illegal drugs or evidence that was concealed....
>
> When he pulled the swim suit away from appellant's body, six "cream colored rocks" of cocaine fell to the ground.[3]

## II.

■ Appellant contends that the second-floor balcony where she was seated when the Ocean City police officers arrived, was part of the curtilage of the dwelling house located at 608 Philadelphia Avenue, and was therefore a constitution-

---

**3.** Officer Amy Hoelscher arrived at 608 Philadelphia Avenue at about 3:30 a.m. on June 29, 2009. She was needed so that a female police officer could search the more intimate parts of appellant's body. Officer Hoelscher testified that she retrieved an "orange prescription pill bottle out of the left side of McGurk's pants." She also retrieved an "altered smoking pipe" used for "smoking crack-cocaine" when she folded down the back-side of McGurk's blue jeans. As she folded down the blue jeans, Officer Valerio illuminated the area with his flashlight. McGurk was not wearing anything under the jeans except a "bathing suit bottom."

Appellant, for various reasons, contends that Officer Hoelscher's search was an illegal strip search. We need not decide that issue because we agree with appellant that the search was the "fruit" of the illegal entry by the police officer onto the balcony.

ally protected area that police officers were not entitled to enter without permission. An area is considered to be part of the curtilage of a dwelling house if it "is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). In response, the State makes three arguments: 1) McGurk never had standing to argue that she was in a constitutionally protected area; 2) even assuming that McGurk had standing, the second-floor balcony was not part of the curtilage of 608 Philadelphia Avenue, and 3) even if the second-floor balcony was a part of the curtilage, entry by the Ocean City police officers was still lawful based on "extigent circumstances."

## A. Standing

▉ Immediately prior to the hearing on McGurk's motion to suppress, defense counsel filed a lengthy memorandum contending, *inter alia,* that the entry by the police upon the second-floor balcony violated Ms. McGurk's Fourth Amendment Rights. During the suppression hearing, Ms. McGurk testified that on the evening in question she was an overnight guest of the lessor of 608 Philadelphia Avenue, and that when she arrived she carried her belongings in an overnight bag. The prosecutor did not cross-examine appellant in regards to this testimony, nor did the prosecutor introduce evidence to contradict that testimony. Moreover, at no time during the hearing did the prosecutor indicate that she contested Ms. McGurk's standing.

After hearing the testimony of appellant, along with that of several Ocean City police officers, defense counsel presented oral argument in support of the suppression motion but the prosecutor made no oral reply. Instead, the prosecutor accepted the motions judge's offer to allow her to reply in a written memorandum. The State subsequently filed a lengthy reply memorandum. Significantly, however, the State never contended in its memorandum that McGurk lacked standing.

On appeal the State contends that McGurk lacks standing to raise the contention that the police officer's entry onto the balcony was illegal. Nevertheless, it admits that in *Minnesota v. Olson*, 495 U.S. 91, 98–99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court held "that an overnight guest in a house had a reasonable expectation of privacy in the host's home" and therefore—such a guest has a right to contest the entry of police into that home. The State also admits that Ms. McGurk testified that on the evening she was arrested she was an overnight guest of the lessor of the premises known as 608 Philadelphia Avenue. The State nevertheless argues:

Because the suppressing court denied McGurk's motion to suppress without making factual findings on the record, her self-serving testimony as to her relationship to the property deserves no credit. Thus the record is devoid of any credible evidence that McGurk had a reasonable expectation of privacy in any area of 608 Philadelphia Avenue, and thus, she was in no position to raise a Fourth Amendment challenge to the alleged unlawful entry.

We hold that by failing to raise the standing issue in the circuit court, the State waived that issue for appellate purposes. *See* Maryland Rule 8–131(a) (except for jurisdictional issues, an appellate court will ordinarily not decide any other issue neither raised nor decided in the circuit court).

In *McCain v. State*, 194 Md.App. 252, 4 A.3d 53 (2010), the State contended on appeal that the appellant, Sheldon McCain, did not have standing to contest a search, by police officers, of his Wife's purse, because appellant had no "expectation of privacy in the purse." *Id.* at 278, 4 A.3d 53. But at the suppression hearing, the State did not contend that appellant lacked standing. *Id.* What we said in *McCain* is here apposite:

Because the search at issue was without a warrant, the State had the burden of production and persuasion at the suppression hearing. *See, e.g., Epps v. State*, 193 Md.App. 687 [1 A.3d 488] (2010). As appellant correctly notes in his reply brief, the State did not contend at the suppression

hearing that appellant lacked a legitimate expectation of privacy in Ms. McCain's purse. As the issue was neither raised before, nor decided by, the circuit court, we can consider the State's contention only through the exercise of the discretion conferred upon us by Maryland Rule 8–131(a). *Epps,* [193 Md.App. at 708–10, 1 A.3d 488] (citing, among other cases, *Jones v. State,* 379 Md. 704, 713–14 [843 A.2d 778] (2004), and *State v. Bell,* 334 Md. 178, 187–88 [638 A.2d 107] (1994)).

We decline to do so in this case. Whether a party has a legitimate expectation of privacy in another's property depends in part upon a consideration of the facts supporting the assertion of the expectation. *See Laney v. State,* 379 Md. 522, 545–46 [842 A.2d 773] (2004). Because the State did not raise the issue at the suppression hearing, there was no reason for appellant to present such evidence and he did not. Under these circumstances, consideration of the standing issue for the first time on appeal would be unfair to appellant. *Jones,* 379 Md. at 714 [843 A.2d 778] (the discretion to review an unpreserved issue "should not be exercised when it will work an unfair prejudice to the parties.")

*Id.* at 278–79, 4 A.3d 53. *See also, State v. Mason,* 173 Md.App. 414, 428–29, 919 A.2d 752 (2007).

As pointed out in *McCain,* under Md. Rule 8–131(a), we have discretion to decide non-jurisdictional issues not raised or decided below, but we should not exercise that discretion and consider such issues if to do so would prejudice one or more of the parties. Here Ms. McGurk would clearly be prejudiced if we were to entertain the standing issue. First, in the circuit court Ms. McGurk's counsel never had a chance to convince the judge that the State's argument that his client was lying should be rejected. Second, it would be unfair to *infer* from a silent record that the trial judge disbelieved Ms. McGurk's uncontested and uncontroverted testimony as to standing.[4]

---

4. We note that there was nothing unlikely about Ms. McGurk's testimony that she was an overnight guest. In all likelihood she probably was

### DISCUSSION

## B. Is the Second Story Balcony a Constitutionally Protected Area?

"[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (citations omitted). A two-part test is to be used to determine whether the government has invaded an individual's reasonable expectation of privacy: "[f]irst, an individual must demonstrate that he had an actual subjective expectation of privacy. Second, society must be willing to recognize that expectation as reasonable." *Kitzmiller v. State,* 76 Md.App. 686, 690, 548 A.2d 140 (1988) (citation omitted). As explained by a concurring opinion in *Katz:*

As the Court's opinion states, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the

staying overnight somewhere, and, at a minimum, it was likely that she was staying overnight at 608 Philadelphia Avenue because, by 3:15 a.m. more than one-half of the night had elapsed, and she was still on the premises when Officer Valerio first saw her.

expectation of privacy under the circumstances would be unreasonable.

*Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring); *accord State v. Sampson,* 362 Md. 438, 444, 765 A.2d 629, *cert. denied,* 532 U.S. 1056, 121 S.Ct. 2202, 149 L.Ed.2d 1032 (2001).

■ In considering the first part of this test, this Court has stated that "the Fourth Amendment applies only to 'constitutionally protected areas' such as a person's house or curtilage." *Sproates v. State,* 58 Md.App. 547, 557, 473 A.2d 1289 (1984). Thus, the first question we must determine is whether the second story balcony in question was part of the curtilage of 608 Philadelphia Avenue. The curtilage is the area immediately surrounding the home "to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' and therefore has been considered part of the home itself for Fourth Amendment purposes." *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (citations omitted); *see also Cal. v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ("The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened"); *Walls v. State,* 179 Md. App. 234, 249, 944 A.2d 1222 (2008) ("The Fourth Amendment's protection of a person's home from unreasonable searches and seizures extends to the home's curtilage, that is, to the land immediately surrounding and associated with the residence."). As Professor LaFave has explained:

The home "is accorded the full range of Fourth Amendment protections," for it is quite clearly a place as to which there exists a justified expectation of privacy against unreasonable intrusion. It is beyond question, therefore, that an uncontested entry into a residential unit, be it a house or an apartment or a hotel or motel room, constitutes a search within the meaning of *Katz v. United States.* Moreover, this Fourth Amendment protection (and thus this search characterization of an entry) extends even to "occupants of flimsily constructed dwellings with unobstructed windows or

other openings directly on public lands, streets, or sidewalks, who failed to lock their doors to bar entrance. 1 LaFave, *Search and Seizure*, § 2.3(b) at 565 (4th ed.2004) (footnotes omitted).

The Supreme Court has held that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *accord Oliver*, 466 U.S. at 180, 104 S.Ct. 1735. In *Dunn*, the court held that the central component of this inquiry, "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life," is resolved with reference to four factors, including:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. at 301, 107 S.Ct. 1134.

Applying these factors, the second story balcony at issue is a part of the home itself. It is located ten feet above street level, and includes a waist high wooden railing on the west and north sides of the building, which means that passersby on the sidewalk or on Philadelphia Avenue would not have a clear view of what is taking place on the balcony. Located on the balcony are some flowers and plants as well as a glass table. There was at least one chair along with "a two-person style rocking chair" on the balcony, which suggests that the balcony is used for purposes akin to uses served by a room inside a house. All of these factors suggest that the balcony was within the curtilage of the home located at 608 Philadelphia Avenue.

In regard to the last factor, the steps taken by the resident to protect the area from observation, we note that on the one hand, the wooden railing prevents persons on the highway or sidewalk from seeing most, but not all, of what is taking place

on the balcony. On the other hand, the external staircase leading up to the balcony is very close to the sidewalk and there is no evidence that there is a gate or other device preventing access from the stairway to the balcony. This last factor, while significant, does not outweigh the other factors supporting appellant's subjective expectation of privacy. Certainly an occupant of the balcony at issue would not expect an uninvited stranger to climb the steps and enter onto the balcony in the middle of the night. The balcony was in no sense a "public place." Thus, we hold that the balcony leading to the second story at 608 Philadelphia Avenue, was part of the curtilage of the home, and that appellant, while on that balcony, had a subjective expectation of privacy.

The next part of the *Katz* test is whether that subjective expectation was objectively reasonable. Here, the parties have not cited, nor have we been able to find, a case dealing with a warrantless entry by police onto a balcony of a residence accessible by an external staircase that begins at a sidewalk bordering on a public street. Instead, the State analogizes this case to those where the police entry was at the front door or front porch of a residence. With respect to the front door to a residence, this Court has observed:

People commonly have different expectations, whether considered or not, for the access areas of their premises than they do for more secluded areas. Thus, we do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck. In the course of urban life, we have come to expect various members of the public to enter upon such a driveway, e.g., brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, friends. Any one of them may be reasonably expected to report observations of criminal activity to the police. *If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that police will do so.*

Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment. But other portions of the lands adjoining the residence are protected, and thus if the police go upon these other portions and make observations there, this amounts to a Fourth Amendment search. (Footnotes omitted).

*Brown v. State,* 75 Md.App. 22, 33–34, 540 A.2d 143 (1988) (citations omitted)(emphasis added); *see also United States v. Taylor,* 90 F.3d 903, 909 (4th Cir.N.C.1996) (concluding that police observation of cocaine and currency through large picture window next to the front door where the officers were standing was not an illegal search because the front entrance "was as open to the law enforcement officers as to any delivery person, guest, or other member of the public").

The Supreme Court considered front door access in *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). There, following a controlled buy of heroin at Santana's house, police officers returned to that location and observed Santana "standing in the doorway of the house with a brown paper bag in her hand." *Id.* at 40, 96 S.Ct. 2406 (footnote omitted). After yelling, "Police," Santana retreated into the vestibule of her house and the police followed her inside, where they apprehended her and found heroin inside the same bag. *Id.* at 40–41, 96 S.Ct. 2406. One of the issues before the Supreme Court was whether Santana was in a "public place" when the police first sought to arrest her. *Id.* at 42, 96 S.Ct. 2406. Relying on *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Supreme Court concluded that Santana was in a public place and that the arrest was lawful, reasoning as follows:

While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santa-

na was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Hester v. United States,* 265 U.S. 57, 59 [44 S.Ct. 445, 68 L.Ed. 898] (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in *Watson.*

*United States v. Santana,* 427 U.S. at 42, 96 S.Ct. 2406.[5]

Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal *per se,* or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964); *see also Robinson v. Commonwealth,* 47 Va.App. 533, 625 S.E.2d 651, 658 (2006) ("The landowner's implied consent is generally presumed to exist absent evidence of an affirmative intent to exclude the public from the premises"), *aff'd,* 273 Va. 26, 639 S.E.2d 217 (2007), *cert. denied,* 550 U.S. 957, 127 S.Ct. 2442, 167 L.Ed.2d 1131 (2007).

Courts in other jurisdictions have concluded that, whether or not it is curtilage, there is generally no reasonable expectation of privacy in a front porch. *See United States v. Weston,*

---

**5.** The Court also concluded that the police could arrest Santana under the exigent circumstances concept of "hot pursuit," stating, "[o]nce Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence." *Id.* at 42–43, 96 S.Ct. 2406.

443 F.3d 661, 667 (8th Cir.2006) (holding that a warrantless entry onto the curtilage was not unreasonable where the intrusion was limited and where a legitimate law enforcement objective exists) (citation omitted), *cert. denied,* 549 U.S. 956, 127 S.Ct. 417, 166 L.Ed.2d 274 (2006); *Murphy v. Gardner,* 413 F.Supp.2d 1156, 1167–68 (D.Colo.2006) (unenclosed front porch which contained homeowner's mailbox and newspaper rack did not constitute curtilage for Fourth Amendment purposes); *State v. Deary,* 753 So.2d 200, 201 (La.2000) (stating that, while a front porch is curtilage, "[a] front porch does not necessarily enjoy the same measure of protection accorded the home by the Fourth Amendment, however, because of 'an almost implicit understanding and custom in this country that, in the absence of signs or warning, a residence may be approached and the occupants summoned to the door by knocking' ") (citations omitted); *State v. Kitchen,* 572 N.W.2d 106, 111–12 (N.D.1997) (concluding, even if the area was curtilage, it was reasonable for the police to enter a vestibule—like area, through a screen door, in order to knock on the interior door which was the main entryway to the house); *State v. Johnson,* 171 N.J. 192, 793 A.2d 619, 629 (2002) (upholding search of a front porch area because "the porch involved in this case, although part of the curtilage, has a diminished expectation of privacy"); *Commonwealth v. Gibbs,* 981 A.2d 274, 280 (Pa.Super.Ct.2009) (holding that front porch that "butt[ed] up against the sidewalk" was not within the curtilage of the home), *appeal denied,* 607 Pa. 690, 3 A.3d 670 (2010); *see also Commonwealth v. Pietrass,* 392 Mass. 892, 467 N.E.2d 1368, 1373 (1984) (remanding because the record was not clear if the front porch was curtilage, stating that "[i]f the porch were one that a visitor would naturally expect to pass through to gain access to the front door, then it would not be part of the 'curtilage' entitled to Fourth Amendment protection. . . . On the other hand, if the porch door were the real front door of the house, the search would begin when the police stepped inside the porch").

In our view, however, the record does not support the State's suggestion that the second story balcony where

McGurk was sitting when arrested was akin to a "front porch" or otherwise served as the primary threshold for entry into 608 Philadelphia Avenue. The State cites *Christian v. State,* 172 Md.App. 212, 914 A.2d 151 (2007), and a Virginia case, *Robinson v. Commonwealth,* supra, in support of its argument that appellant had no reasonable expectation of privacy in this case. Both cases are inapposite.

In *Christian,* police officers observed appellant walk out of a rowhouse, located at 19 North Glover Street, and then place a bag in between the screen door and the front door. *Id.* at 216, 914 A.2d 151. Appellant walked away, and sat on the steps of another home. *Id.* While the police were conducting their surveillance, they observed appellant engage in conversation with an individual, walk back to the 19 North Glover Street address, retrieve an item from the bag that was inside the screen door, and then exchange that item for U.S. currency. *Id.* at 217, 914 A.2d 151. Suspecting that appellant was engaged in drug distribution, a police officer went to the front of 19 North Glover, and seized the bag that was in between the screen door and the front door of the residence. *Id.* The bag contained 119 gel caps of heroin. *Id.*

While not expressly saying whether the screen door was within the curtilage of the home, we agreed with the suppression court's ruling that the screen door in question was of the variety that would be accessible to strangers approaching the residence. *Id.* at 220, 914 A.2d 151. Recognizing that a screen door serves different functions depending on the time of year, we stated that "[t]he distinguishing factor is not whether the time of year is summer or winter, but whether the screen door is acting as the perimeter barrier to the residence." *Id.* at 221, 914 A.2d 151. In that case the solid door to the residence was closed, but the screen door "would have been opened by delivery men and others approaching the house." *Id.* at 222, 914 A.2d 151. Under these circumstances, "appellant had no reasonable expectation of privacy in the space between the screen door and the solid entry door of the rowhouse." *Id.* In this case, the record does not support the State's suggestion that delivery men, salesmen, or other

strangers would be expected to come onto the balcony to conduct business—unless invited.

In *Robinson v. Commonwealth,* police responded to a home after receiving reports that an underage drinking party was underway. 625 S.E.2d at 654. A police officer drove upon Robinson's property and parked his vehicle in the parking area near the garage. From that vantage point the officer observed persons who appeared to be underage holding beer bottles and then fleeing once police presence was observed. The Court held that "on the night in question, Robinson impliedly consented to have members of the public—including police officers—enter the premises in an attempt to contact the residents of that property." *Id.* at 657. The Court stated, that "[i]t is generally recognized that, absent any affirmative attempts to discourage trespassers, owners or possessors of private property impliedly consent to have members of the general public intrude upon certain, limited areas of their property." *Id.* The *Robinson* Court went on to say:

> *This invitation, where it exists, extends only to those areas of the property that would be used when approaching the residence in an ordinary attempt to speak with the occupants. Thus, areas of the curtilage that a visitor could reasonably be expected to cross when approaching the front door—for example, the driveway, front sidewalk, and front porch—are generally exempted from Fourth Amendment protection.* As a result, if the property owner has impliedly consented to have members of the public use a particular "path" when attempting to access his home, he has waived any reasonable expectation of privacy in areas of the curtilage associated with that "path."
>
> By extension, the same implied consent is extended to police officers who enter the curtilage and, while on the premises, restrict their conduct to those activities reasonably contemplated by the homeowner.

*Id.* (citations omitted) (emphasis added).

The *Robinson* court listed a number of factors to determine whether the landowner intended to exclude the public from

the premises, including: "(1) whether the homeowner has erected any physical barriers, such as gates or fences, across the entrance to the property, and (2) whether the homeowner has posted signs, such as 'no trespassing' or 'private property' signs, indicating a desire to exclude the public from the premises." *Id.* at 658. The *Robinson* Court concluded that the officer had implied consent from the landowners to enter the premises and park. *Id.*

In *Robinson,* the Court then went on to consider whether the officer exceeded the scope of that consent when he discovered underage drinking on the premises. Resolution of this question was said to depend upon the facts and circumstances of each case. *Id.* at 659. Relevant factors under that test included:

> [W]hether the officer (1) spied into the house; (2) acted secretly; (3) approached the house in daylight; (4) used the normal, most direct route to the house; (5) attempted to talk with the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally.

*Id.* at 659 n. 7 (quoting *State v. Ross,* 91 Wash.App. 814, 959 P.2d 1188, 1190 (1998)).

The *Robinson* Court noted that uninvited visitors to a home are normally "expected to come to the residence's most direct, obvious, and prominent entryway," and are generally "expected to leave by the same route," unless the circumstances "indicate that the visitor 'could reasonably be expected to seek out residents through areas other than the front door.'" *Id.* at 659. (citations omitted). Further, the Court observed that entering the residence late at night, especially if accompanied by some subterfuge, may be outside the scope of implied consent:

> Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm. As compared to open daytime approaches, surreptitious searches under the cover of darkness create a greater risk of armed response—with potentially tragic

results—from fearful residents who may mistake the police officers for criminal intruders.

*Id.* (citations omitted).

The *Robinson* Court ultimately concluded that the police officers did not exceed the scope of the implied consent extended to visitors on the night of the party. *Id.* The Court stated:

> Considering the totality of the circumstances, we conclude that, on the night in question, the implied invitation to enter Robinson's premises was still open even at this late hour, and Officer Cox did not exceed the scope of this implied consent when he drove up Robinson's driveway and parked his car in the parking area by the garage.

*Id.* at 660.

In this case, by contrast, there was no implied invitation because there is no indication that entry into 608 Philadelphia Avenue is normally accomplished by walking up the steps to the second story balcony as opposed to entering the house by ground level front door.

The case that we have found that is factually most analogous is *State v. Neanover*, 812 N.E.2d 127 (Ind.Ct.App.2004). In *Neanover*, the evidence established that Alicia Neanover lived with her husband in one of two apartments located at the top of a three-story apartment building. *Neanover*, 812 N.E.2d at 128. Outside the door to their apartment was an open landing area where Neanover kept a patio table and chairs; she used the landing area for recreation and storage. *Id.* Sometimes, as on the night in question, the Neanovers would temporarily place garbage on the landing prior to taking that garbage downstairs to an area enclosed by a fence across from the building's parking lot. *Id.*

The police received a citizen complaint that marijuana was growing inside Neanover's apartment. *Id.* Responding to the apartment and receiving no answer after knocking on the Neanover's door, the police seized bags of garbage that had been left outside the apartment door on the open landing area. *Id.* Police found evidence of marijuana use in that garbage and

subsequently charged Neanover with possession of marijuana. *Id.* at 129.

On appeal, the Indiana intermediate appellate court ruled that the Neanovers had both a subjective expectation of privacy with respect to the landing area, and that this expectation was objectively reasonable under the circumstances. *Id.* at 130. Looking to the evidence, the Court determined that "Neanover had a subjective expectation of privacy insofar as she treated the landing area outside her apartment door as a combination patio/storage space, a zone of privacy akin to curtilage." *Id.* Furthermore, this expectation of privacy was objectively reasonable because, "[a]lthough the third-floor landing was open and accessible to the general public, the landing was not *readily* accessible." *Id.* (emphasis in original).

Based on our research and the record developed at the suppression hearing, we are persuaded that appellant's subjective expectation of privacy in the second story balcony area was objectively reasonable. Besides what has already been said, we find support for this conclusion by the fact that the officers walked up the external staircase at 3:15 a.m. It is not unreasonable to assume that, at this hour, a person in appellant's position would not expect uninvited visitors to ascend the staircase to gain access to the balcony.

## C.

### Exigent Circumstances

■ The State argues, in the alternative:

Assuming *arguendo* that McGurk had some minimal expectation of privacy in the balcony of the 608 Philadelphia Road, the police encounter was still lawful based on exigent circumstances. Officer Valerio was on routine patrol on Philadelphia Avenue when he detected the odor of burning marijuana. The officer had no reason to suspect that there was marijuana being smoked at 608 Philadelphia Avenue until he could smell it. Furthermore, the record supports the inference that Valagra became aware of the police

presence because Valagra testified that he and McGurk were watching traffic from the balcony and something Valagra observed caused him to discard the roach he and McGurk were smoking. The circumstances establish that Valerio did not create the exigency, and it was reasonable for him to believe both that Valagra and McGurk were aware of his presence and that the marijuana would be destroyed before a warrant could be obtained. Thus, Valerio's entrance onto the balcony of 608 Philadelphia Road was justified by exigent circumstances. *Gorman v. State*, 168 Md.App. 412, 429, 897 A.2d 242 (2006).

 "[A]bsent exigent circumstances a warrantless search of one's home or its curtilage, when effected through trespass, violates the Fourth Amendment." *United States v. Van Dyke*, 643 F.2d 992, 993 (4th Cir.1981); *see also State v. Pando*, 284 Ga.App. 70, 643 S.E.2d 342, 345 (2007) ("It is axiomatic that, under the Fourth Amendment, police officers are prohibited from entering a person's home or its curtilage without a warrant absent consent or a showing of exigent circumstances"); *Jefferson v. Commonwealth*, 27 Va.App. 1, 497 S.E.2d 474, 481 (1998) ("Thus, absent (1) exigent circumstances and probable cause or (2) consent, law enforcement agents cannot enter the curtilage of a person's home either to search or seize without previously obtaining a warrant") (citation omitted).

 Because the exigent circumstances exception to the warrant requirement "is a narrow one[,] . . . [a] heavy burden falls on the government to demonstrate exigent circumstances that overcome the presumptive unreasonableness of warrantless home entries." *Williams v. State*, 372 Md. 386, 402–03, 813 A.2d 231 (2002) (citations omitted). "Exigent circumstances" are those in which "the police are confronted with an emergency—circumstances so imminent that they present an urgent and compelling need for police action." *Paulino v. State*, 399 Md. 341, 351, 924 A.2d 308 (citation omitted), *cert. denied*, 552 U.S. 1071, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007). "Exigent circumstances include 'an emergency that requires

immediate response; hot pursuit of a fleeing felon; and imminent destruction or removal of evidence.'" *Gorman v. State,* 168 Md.App. 412, 422, 897 A.2d 242 (2006) (citation omitted). As we said in *Gorman:*

> Certain factors must be considered in the determination of whether exigent circumstances are present: "the gravity of the underlying offense, the risk of danger to police and the community, the ready destructibility of the evidence, and the reasonable belief that contraband is about to be removed." Also "relevant to the determination ... is the opportunity of the police to have obtained a warrant."

*Id.* at 422, 897 A.2d 242 (citations omitted); *see also Welsh v. Wis.,* 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) ("[I]t is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor").

 Moreover, "to satisfy its heavy burden, the State must demonstrate 'specific and articulable facts to justify the finding of exigent circumstances.'" *Williams,* 372 Md. at 407, 813 A.2d 231 (quoting *United States v. Shephard,* 21 F.3d 933, 938 (9th Cir.1994)). We consider the facts as they appeared to the police officers at the time of the warrantless entry. *Williams,* 372 Md. at 403, 813 A.2d 231. The State's burden "may not be satisfied 'by leading a court to speculate about what may or might have been the circumstances.'" *Id.* at 407, 813 A.2d 231 (quoting *United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985)).

The Supreme Court has recognized that "[s]uspects have no constitutional right to destroy or dispose of evidence[.]" *Ker v. California,* 374 U.S. 23, 39, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *see also United States v. Johnson,* 802 F.2d 1459, 1462 (D.C.Cir.1986) ("The need to preserve evidence that may be lost or destroyed if a search is delayed is and has long been recognized as an exigent circumstance."). Courts have also suggested that a showing of urgency may be easier to establish when narcotics are involved because " 'narcotics can be easily and quickly destroyed while a search is progressing.' "

*United States v. Socey,* 846 F.2d 1439, 1444–45 (D.C.Cir.) (quoting *Johnson,* 802 F.2d at 1462), *cert. denied,* 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); *see United States v. Cephas,* 254 F.3d 488, 496 (4th Cir.2001) (noting that occupant's awareness that the police were at his doorstep, that marijuana is easily destructible, and that the officer believed that marijuana would be destroyed before a warrant could be obtained would have justified warrantless entry); *Cameron v. State,* 861 So.2d 1145, 1152 (Ala.Crim.App.2003) (where the police had probable cause to believe marijuana was inside the residence and observed the resident, who was aware of the police presence, trying to hide things, there was a sufficient exigency to justify the warrantless entry); *State v. Kosman,* 181 Ariz. 487, 892 P.2d 207, 211 (1995) (noting that smell of burning marijuana, which indicated that marijuana was being destroyed, combined with the fact that occupants did not respond to police inquiry was sufficient exigent circumstance to justify warrantless entry) (citation omitted); *see also State v. Hughes,* 233 Wis.2d 280, 607 N.W.2d 621, 628 (2000) ("Marijuana and other drugs are highly destructible"), *cert. denied,* 531 U.S. 856, 121 S.Ct. 138, 148 L.Ed.2d 90 (2000).

We disagree with the State's argument that the motions judge could infer that appellant's companion, Valegra, discarded the "roach" because he saw the officer on his bike. There was no direct or circumstantial evidence as to why Valegra discarded the marijuana cigarette. In order to accept the State's argument a fact-finder would have to engage in raw speculation. But even if such an inference could be drawn, the State would not benefit. It is undisputed that the police officer never discovered that a roach had been thrown away or that either of the balcony occupants had smoked marijuana until after he entered onto the balcony. Therefore, he could not possibly have believed that exigent circumstances permitted his entry. Quite obviously, an entry into a constitutionally protected area cannot be justified based on "exigent circumstances" unknown to the police.

Both parties direct our attention to *Gorman, supra,* in support of their respective positions. In *Gorman,* Sergeant

Steven Nalewajkl was called to investigate a shooting and found that Gorman had sustained a gunshot wound. 168 Md.App. at 416, 897 A.2d 242. Gorman's girlfriend, Leslie Harmon, was with Gorman at the scene of the shooting. Because Harmon was pregnant and not wearing shoes, Sergeant Nalewajkl escorted Harmon to her apartment, which was about five blocks from the scene of the shooting. *Id.*

When they arrived, the officer accompanied Harmon to the front door of the second floor apartment. He was concerned that Harmon might be difficult to find later during the investigation. *Id.* at 417, 897 A.2d 242. Harmon knocked, and Curtis Painter opened the door to the apartment. *Id.* When the apartment door was opened, Sergeant Nalewajkl "smelled the odor of burnt marijuana emanating from the apartment." *Id.* Seeing that Painter was "extremely nervous," Sergeant Nalewajkl asked him what he was so nervous about, and Painter replied that "he had two bags of weed." *Id.* at 418, 897 A.2d 242. Painter was then placed under arrest. *Id.* Police later searched the entire apartment and, found cocaine, and various firearms. Gorman was later indicted for narcotics and firearms-related offenses. *Id.* at 419, 897 A.2d 242.

Gorman contended that the entry into his apartment was not justified under exigent circumstances. *Id.* at 420, 897 A.2d 242. This Court disagreed, stating:

> Sgt. Nalewajkl accompanied Harmon to the apartment only to ensure that she, a potential witness to an apparently unrelated shooting, would not wander off. The trip to the apartment was prompted by Harmon's need to pick up her shoes. Nalewejkl's apprehension of an exigency arose only after he perceived, from the threshold of the apartment through the open door, Painter's nervousness and the odor of marijuana. Nalewajkl was also suspicious of Painter's delay in opening the door.

*Gorman,* 168 Md.App. at 424–25, 897 A.2d 242 (footnote omitted).

In reaching this conclusion, the *Gorman* Court distinguished *Dunnuck v. State,* 367 Md. 198, 786 A.2d 695 (2001).

In *Dunnuck*, the police were conducting an ongoing investigation of Dunnuck based on an anonymous tip that marijuana plants could be seen through the window of Dunnuck's house. *Id.* at 209, 786 A.2d 695. An officer went to Dunnuck's house where he observed marijuana growing in a birdcage that could be seen through the window. *Id.* Rather than applying for a search warrant, the officer called for backup units to keep surveillance on the house to see if anyone returned, with the plan to secure a warrant after someone else arrived at the home. *Id.* at 210, 786 A.2d 695. At least an hour after the officer's first arrival at the house, Dunnuck arrived home. *Id.* The officers knocked on the door and announced: "Queen Anne's County Drug Task Force. We need to come in." *Id.* at 210–11, 786 A.2d 695. Shortly thereafter, another officer observed through a window that the marijuana plant was being moved, at which time the officers began kicking in the front door. *Id.*

The Court of Appeals found that the warrantless intrusion was unreasonable given that the police officers had created the exigency. The Court said:

> Whether intended consciously or not, the necessary result of the police conduct in this case was to create an exigency that would justify a warrantless entry. Having seen the contraband as they were told they would and knocked on the petitioner's door and found no one at home, rather than going immediately to obtain a warrant, for the issuance of which it is undisputed they had probable cause, the police gathered a short distance from the house and watched the house, after calling for back-up. Considering that no one was at home and, presumably, was aware of the police investigation, and that there was clear probable cause for believing that a crime was being committed, it is difficult to understand what securing the house meant, or was intended to accomplish.

*Id.* at 215–16, 786 A.2d 695.

In *Gorman*, we distinguished *Dunnuck* because in *Gorman* the officer did not have "probable cause to believe that the

crime of marijuana possession was occurring within the residences until *after* their arrival." *Gorman,* 168 Md.App. at 429, 897 A.2d 242 (emphasis in original). The officers did not create the exigency. Furthermore, the residents in *Gorman* "had knowledge of the police presence and, presumably, detection of the odor of marijuana." *Id.* Thus, police did not have time to obtain a search warrant. *Id.*

In the case *sub judice,* Officer Valerio admitted that he did not know that the marijuana odor was coming from the balcony until *after* he walked up the steps of 608 Philadelphia Avenue. He therefore did not have probable cause to believe that the occupants of the balcony had committed a crime at the time he entered onto the balcony. Unlike *Gorman,* where the officer had a legitimate reason for being on the premises *before* he smelled marijuana, the officer in this case did not have, or even claim to have, knowledge that the occupants of the balcony were connected to the odor of marijuana until the officer had unlawfully entered onto the balcony.

> While the odor of marijuana provides probable cause to believe that marijuana is present, the presence of marijuana does not of itself authorize the police either to search any place or to arrest any person in the vicinity. *Additional factors must be present to localize the presence of marijuana such that its placement will justify either the search or the arrest.* In the case of a search, when the odor emanates from a confined location such as an automobile or an apartment, we have held that officers may draw the conclusion that marijuana is present in the automobile or the apartment. . . . Thus, if an officer smells the odor of marijuana in circumstances *where the officer can localize its source* to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana.

*United States v. Humphries,* 372 F.3d 653, 659 (4th Cir.2004) (citations omitted, and emphasis added) (ultimately concluding there was probable cause to arrest appellant because the odor of marijuana was particularized to appellant's person).

Here, according to the facts established at the suppression hearing, after the officer smelled the odor of marijuana in the air, he turned around and peddled approximately 60 feet north in an attempt to locate the source of that odor. He turned back to the south and then saw two people sitting on the balcony of 608 Philadelphia Avenue. At that point, he approached the staircase and radioed for assistance. He asked for assistance of other officers to help him" "locate the source of the marijuana." Officer Valerio explicitly admitted that he did not smell the odor of burnt marijuana *on the balcony* until after he asked several questions and "got closer to" Mr. Villagra.

There is no fact present indicating that either Villagra or appellant were engaged in any conduct that suggested that they intended to destroy evidence prior to the officers entry onto the balcony. In fact, there is not even evidence that either appellant or her companion knew that the police intended to come onto the balcony until Officer Valerio did so. Accordingly, there was no exigency permitting the police officer to violate appellant's reasonable expectation of privacy by entering onto the second story balcony of 608 Philadelphia Avenue.

We hold that the motion to suppress should have been granted as to all evidence seized from appellant's purse or person because: 1) the officer's warrantless entry was unreasonable and violated the Fourth Amendment, and 2) all evidence seized from appellant's purse or person were taken as a result of the warrantless entry onto the balcony.

**JUDGMENT VACATED; CASE REMANDED FOR A NEW TRIAL;[6] COSTS TO BE PAID BY WORCHESTER COUNTY.**

---

**6.** The evidence contained in the agreed statement of facts was sufficient to convict. Therefore, a remand for new trial is necessary. We recognize, however, that as a result of our holding in the case it will, in all likelihood, be impossible for the State to convict appellant.